In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM 2021

ARGUED: NOVEMBER 15, 2021
DECIDED: AUGUST 11, 2023

No. 20-1666

ABDERRAHMANE FARHANE,
*Petitioner-Appellant*,

*v.*

UNITED STATES OF AMERICA,
*Respondent-Appellee*,

————

Appeal from the United States District Court
for the Southern District of New York.

————

Before: WALKER, WESLEY, and CARNEY, *Circuit Judges*.

————

Abderrahmane Farhane appeals from the denial in the United States District Court for the Southern District of New York (Loretta A. Preska, *J.*) of his habeas petition to vacate his 2006 guilty plea, conviction, and sentence. Farhane asserts that he received ineffective assistance of counsel because his lawyer did not warn him of the risks of denaturalization and possible subsequent deportation arising from

his guilty plea.  For the reasons that follow, we affirm the district court.

Judge Walker writes for the majority and concurs in a separate opinion.

Judge Carney dissents in a separate opinion.

————

RAMZI KASSEM (Naz Ahmad, Princess Masilungan, Mudassar Toppa, *on the brief*), CLEAR Clinic, Main Street Legal Services, Inc., CUNY School of Law, Long Island City, NY; Alan E. Schoenfeld, Margaret T. Artz, Paloma Naderi, *on the brief*, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, *for Petitioner-Appellant Abderrahmane Farhane.*

JUN XIANG (Karl Metzner, *on the brief*), Assistant United States Attorneys, *for* Audrey Strauss, United States Attorney for the Southern District of New York, New York, NY, *for Respondent-Appellee United States of America.*

Joel B. Rudin, Matthew A. Wasserman, Haran Tae, *on the brief*, National Association of Criminal Defense Lawyers, New York, NY, and Law Offices of Joel B. Rudin, P.C., New York, NY; Timothy P. Murphy, *on the brief*, New York State Association of Criminal Defense Lawyers, Albany, NY, *for amici curiae National Association of Criminal Defense Lawyers and New York State Association of Criminal Defense Lawyers.*

Andrew Z. Michaelson, Ana V.B. Daily, Kathryn R. Barry, *on the brief*, King & Spalding LLP, New York, NY; John C. Yang, Niyati Shah, Marita

Etcubañez, *on the brief*, Asian Americans Advancing Justice, Washington, DC, *for amicus curiae Asian Americans Advancing Justice*.

Andrew D. Silverman, Daniel A. Rubens, Alyssa Barnard-Yanni, Lauren Weber, *on the brief*, Orrick, Herrington & Sutcliffe LLP, New York, NY, Seattle, WA, Washington, DC, *for amici curiae Professors of Criminal Law, Criminal Procedure, Immigration Law, and Legal Ethics*.

Manuel D. Vargas, Marie Mark, Nabilah Siddiquee, Leila Kang, *on the brief*, Immigrant Defense Project, New York, NY, *for amicus curiae Immigrant Defense Project*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

Abderrahmane Farhane appeals from the denial in the United States District Court for the Southern District of New York (Loretta A. Preska, *J.*) of his habeas petition to vacate his 2006 guilty plea, conviction, and sentence. Farhane asserts that he received ineffective assistance of counsel because his lawyer did not warn him of the risks of denaturalization and possible subsequent deportation arising from his guilty plea. For the reasons that follow, we **AFFIRM** the district court.

## BACKGROUND

In 2006, Appellant Farhane, a naturalized American citizen born in Morocco, pleaded guilty to providing false statements to federal law enforcement and conspiring to violate a money laundering statute, 18 U.S.C. § 1956. In his allocution, he stated that, in 2001, he conspired to transfer money to mujahideen in Afghanistan and Chechnya. He was sentenced in the Southern District of New

York to 156 months of imprisonment and two years of supervised release. In 2011, after a lengthy appeal process, his conviction became final.

In 2017, Farhane was released from custody and returned to his home in Brooklyn. In August 2018, the government filed a complaint in the Eastern District of New York seeking to revoke Farhane's citizenship under 8 U.S.C. § 1451(a). Section 1451(a) provides for the civil denaturalization of individuals whose naturalization orders and certificates were "illegally procured or were procured by concealment of a material fact or by willful misrepresentation."[1]

Farhane had been naturalized in 2002. During that process, he told the government, on two forms and in one interview under oath, that he had never knowingly committed a crime for which he had not been arrested. This was a lie. In fact, just a few months earlier, Farhane had conspired with two others (one of whom was an FBI informant) to send money to fighters engaged in jihad in Afghanistan and Chechnya. They discussed the topic multiple times in person and over the phone, and Farhane gave advice as to how to avoid law enforcement detection of the money transfer. Relying on Farhane's 2006 guilty plea to these crimes, the denaturalization complaint alleged that Farhane had been unlawfully naturalized because he had: (a) joined a money laundering conspiracy and (b) concealed it from naturalization authorities.

In December 2018, while still on supervised release after serving his prison sentence, Farhane filed a 28 U.S.C. § 2255 habeas corpus petition in the Southern District of New York to vacate his guilty plea, conviction, and sentence. He asserted that he had received ineffective assistance of counsel at the time of his 2006 guilty

---

[1] 8 U.S.C. § 1451(a).

plea because his lawyer had not warned him of the risk of denaturalization and deportation before he pleaded guilty.[2] The district court denied the petition, concluding that his counsel's failure to warn him of the denaturalization risk was not objectively unreasonable. We granted Farhane's motion for a certificate of appealability. The denaturalization proceeding in the Eastern District has been stayed pending the resolution of Farhane's habeas petition.

## DISCUSSION

On appeal, Farhane claims that he received ineffective assistance of counsel when his lawyer failed to tell him that denaturalization and deportation could be consequences of his pleading guilty. The Supreme Court set forth the test for ineffective assistance in *Strickland v. Washington*, requiring a defendant to establish both his trial counsel's deficient performance and the defendant's resulting prejudice.[3] Farhane argues that the Sixth Amendment required his lawyer to warn him of the possible naturalization and immigration consequences of his guilty plea. Farhane says that, if he had known of these risks, he would not have pleaded guilty.

The government responds by arguing, as a threshold matter, that the Sixth Amendment does not require attorneys to warn of the risk of denaturalization. It also asserts that Farhane cannot establish either element of the *Strickland* test.[4] Because civil denaturalization is

---

[2] The government's complaint only seeks Farhane's denaturalization, but, if it is granted, he anticipates the government will then move to deport him.

[3] *See* 466 U.S. 668, 687 (1984).

[4] The government also offers another argument on this appeal—that Farhane is advancing a "new rule" that, under *Teague v. Lane*, 489 U.S. 288,

a collateral and not a direct consequence of a conviction, we agree that the Sixth Amendment does not require attorneys to warn of that risk. Thus, we affirm the district court.

## I.      The Sixth Amendment and Denaturalization

The Sixth Amendment guarantees criminal defendants the effective assistance of counsel during plea negotiations.[5]  Effective assistance includes warning defendants of the "direct" consequences of pleading guilty, such as the offense's maximum prison term and the likely sentence as set forth in a plea agreement.[6]  We have long held, however, that an attorney need not warn of every possible "collateral consequence of conviction."[7]  Such collateral consequences

---

316 (1989), cannot be established on collateral review.  The government did not make this argument in the district court, however, and has offered no justification for the omission.  Accordingly, the argument is waived.  *See Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994) (noting that "it is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal" when "[n]o reason is offered by the government for the failure to raise it below"); *see also Danforth v. Minnesota*, 552 U.S. 264, 289 (2008) (stating that a litigant "can waive a *Teague* defense, during the course of litigation, . . . by failing to raise it in a timely manner").

[5] *See Lafler v. Cooper*, 566 U.S. 156, 162 (2012).

[6] *See, e.g., Brady v. United States*, 397 U.S. 742, 755 (1970) (defining direct consequences in the closely analogous Fifth Amendment context as including "the actual value of any commitments made to him by the court, prosecutor, or his own counsel"); *United States v. Del Rosario*, 902 F.2d 55, 59 (D.C. Cir. 1990), *abrogated on other grounds by Padilla v. Kentucky*, 559 U.S. 356 (2010); *United States v. Salmon*, 944 F.2d 1106, 1130 (3d Cir. 1991), *abrogated on other grounds by United States v. Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir. 2013).

[7] *United States v. Parrino*, 212 F.2d 919, 921 (2d Cir. 1954); *Santiago v. Laclair*, 588 F. App'x 1, 4 (2d Cir. 2014); *see also Chaidez v. United States*, 655 F.3d 684, 690 (7th Cir. 2011), *aff'd*, 568 U.S. 342 (2013) (noting that "the lower

are "categorically removed from the scope of the Sixth Amendment."[8] A defendant can only establish an ineffective assistance claim as to a collateral consequence if his attorney affirmatively misadvises him.[9] Failing to warn of the collateral risk alone is not enough.

The instant appeal is resolved by the straightforward application of this direct/collateral framework. Farhane and the dissent suggest, however, that this framework may not survive the Supreme Court's decision in *Padilla v. Kentucky*.[10] Accordingly, we take this opportunity to reaffirm the direct/collateral distinction and apply it in the post-*Padilla* context. In doing so, we hold that the distinction remains valid, that it applies to civil denaturalization, and that such denaturalization is a collateral consequence of conviction and so is not covered by the Sixth Amendment's right to effective assistance of counsel.

## A.    The Direct/Collateral Framework

The distinction between direct consequences, as to which a constitutionally competent attorney must advise her client before he enters a guilty plea, and collateral consequences, about which she

---

federal courts, including at least nine Courts of Appeals, had uniformly held that the Sixth Amendment did not require counsel to provide advice concerning any collateral (as opposed to direct) consequences of a guilty plea"); *Torrey v. Estelle*, 842 F.2d 234, 237 (9th Cir. 1988) (holding that "[f]ailure to advise [the defendant] of a collateral penalty cannot be held to be below an objective standard of reasonableness" and thus evidence of ineffective assistance).

[8] *Chaidez v. United States*, 568 U.S. 342, 349 (2013) (quotation marks omitted); *see id.* at 350-52 (describing the "almost unanimous[]" consensus of state and federal courts).

[9] *See, e.g., United States v. Santelises*, 509 F.2d 703, 704 (2d Cir. 1975) (per curiam).

[10] 559 U.S. 356 (2010).

need not, is grounded in the text of the Sixth Amendment. The amendment guarantees a defendant "the [a]ssistance of [c]ounsel for his defen[s]e" in his "criminal prosecution[]."[11] The amendment's scope is thus textually limited to the direct consequences of the prosecution and does not require "sound advice about the collateral consequences of conviction."[12]

This language accords with the practical limitations of law practice. Criminal lawyers are "not expected to possess—and very often do not possess—expertise in other areas of the law, and it is unrealistic to expect them to provide expert advice on matters that lie outside their area of training and experience."[13] Indeed, a conviction's potential collateral consequences are numerous and varied. They include "civil commitment, civil forfeiture, the loss of the right to vote, disqualification from public benefits, ineligibility to possess firearms, dishonorable discharge from the Armed Forces, and loss of business or professional licenses."[14] Some limiting principle is thus required. Otherwise, as Farhane is attempting to do here, guilty pleas could be overturned years or decades later due to events that a competent defense counsel could not have reasonably foreseen.

It is unsurprising, then, that courts have nearly uniformly applied the direct/collateral framework in the Sixth Amendment context. In *Hill v. Lockhart*, the Supreme Court explicitly avoided the question of whether the Sixth Amendment applies to the collateral

---

[11] U.S. Const. amend. VI.

[12] *See Padilla*, 559 U.S. at 388 (Scalia, J., dissenting).

[13] *Id.* at 376 (Alito, J., concurring).

[14] *Id.*

consequences of a guilty plea.[15]  Since then, at least ten circuit courts and thirty state appellate courts have held that "counsel's failure to inform a defendant of the collateral consequences of a guilty plea is never a violation of the Sixth Amendment," with only a handful of state courts concluding otherwise.[16]  Indeed, the framework is so uniformly applied that, despite lacking explicit Supreme Court sanction, it has been described as "one of the most widely recognized rules of American law."[17]

Our dissenting colleague suggests that this substantive and precedential firmament was undermined by the Supreme Court's opinion in *Padilla v. Kentucky*.  In *Padilla*, the Court held that the Sixth Amendment required counsel to "inform her client whether his plea carries a risk of deportation."[18]  This holding contravened the "almost unanimous[]" circuit court consensus that deportation was a collateral consequence of conviction.[19]  In so holding, the Court noted that it had "never applied a distinction between direct and collateral consequences to define the scope" of effective counsel.[20]

Thus, *Padillia* "breach[ed] the previously chink-free wall between direct and collateral consequences."[21]  But, in doing so, it did

---

[15] 474 U.S. 52, 60 (1985); *see Chaidez*, 568 U.S. at 349 (characterizing the decision).

[16] *Chaidez*, 568 U.S. at 350 (quotation marks omitted).

[17] *Id.* at 351 (quotation marks omitted).

[18] 559 U.S. at 374.  At times, the opinion refers generally to "immigration consequences."  *See, e.g., id.* at 369.  The holding and reasoning, however, are clearly limited to deportation arising from a criminal conviction.

[19] *Chaidez*, 568 U.S. at 350.

[20] *Padilla*, 559 U.S. at 365-66.

[21] *Chaidez*, 568 U.S. at 352-53.

not reject the direct/collateral framework altogether. Instead, it held that the framework was "ill suited to evaluating" whether the risk of deportation was covered by the Sixth Amendment duty to warn because of deportation's "particularly severe" nature and near-automatic relationship to criminal conviction.[22] These characteristics made it "uniquely difficult to classify as either a direct or a collateral consequence."[23] Subsequently, Justices have emphasized that *Padilla* "did not eschew the direct-collateral divide across the board"[24] and that deportation is "the most difficult penalty to classify as either a collateral or direct consequence."[25]

Our court has also recognized *Padilla*'s narrow reasoning, noting that it was "limited to . . . deportation,"[26] as has the Seventh Circuit, which stated that "*Padilla* is rife with indications that the Supreme Court meant to limit its scope to the context of deportation only."[27] In the face of the Sixth Amendment's text, the practical necessity, and our well-established precedent, *Padilla*'s "chink" in the otherwise solid wall of precedent does not justify the wholesale abandonment of the direct/collateral distinction. Instead, we align ourselves with the Seventh Circuit in applying our pre-*Padilla* precedents and affirming the distinction's threshold applicability to the Sixth Amendment.[28]

---

[22] *Padilla*, 559 U.S. at 365-66.

[23] *Id.* at 357.

[24] *Chaidez*, 568 U.S. at 355.

[25] *Id.* at 366 (Sotomayor, J., dissenting) (quotation marks omitted).

[26] *United States v. Youngs*, 687 F.3d 56, 62 (2d Cir. 2012).

[27] *United States v. Reeves*, 695 F.3d 637, 640 (7th Cir. 2012).

[28] *Id.*

The dissent argues that "many courts have responded [to *Padilla*] by closely reexamining their Sixth Amendment precedents," but offers in support only a handful of state supreme and intermediate court cases and one non-precedential Tenth Circuit summary order addressing *Padilla* briefly in a footnote.[29] Meanwhile, several state supreme courts and a circuit court have reaffirmed the pre-*Padilla* framework.[30] The cases cited by the dissent do not amount to a widespread reconsideration of the previously settled law, which is unsurprising given *Padilla*'s explicitly limited scope. The few state court cases cited by the dissent do not justify ignoring our longstanding precedent.[31]

Our dissenting colleague acknowledges that *Padilla* did not "eradicate[] entirely the direct/collateral framework in the Sixth Amendment context" and that "[t]he dichotomy will continue to apply usefully in some—even many or most—cases."[32] She argues, however, that the applicability of the framework should be addressed consequence by consequence. But the utility of the framework

---

[29] *See, e.g.*, Diss. Op. at 9, 16 n.9 (citing *United States v. Tuakalau*, 562 F. App'x 604, 609 n.4 (10th Cir. 2014) (summary order); *Commonwealth v. Thompson*, 548 S.W.3d 881, 891-94 (Ky. 2018); *Alexander v. State*, 772 S.E.2d 655, 659 (Ga. 2015); *People v. Hughes*, 983 N.E.2d 439, 454-56 (Ill. 2012); *Commonwealth v. Pridham*, 394 S.W.3d 867, 879 (Ky. 2012); *Taylor v. State*, 698 S.E.2d 384, 388 (Ga. Ct. App. 2010)).

[30] *See, e.g.*, *Reeves*, 695 F.3d 637; *Taylor v. State*, 887 N.W.2d 821, 823 (Minn. 2016); *State v. Trotter*, 330 P.3d 1267, 1269 (Utah 2014).

[31] *See In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 155 (2d Cir. 2015), as amended (Dec. 17, 2015), *aff'd sub nom. Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018) (noting that we are bound to follow our precedent unless there is "conflict, incompatibility, or inconsistency" between it and a intervening Supreme Court decision (quotation marks and alterations omitted)).

[32] Diss. Op. at 14.

necessarily lies in it being a guide to defense counsel when advising a client in advance of a guilty plea. The framework as it exists allows defense lawyers to classify the many different types of consequences of conviction as either direct or collateral. Artificially dismantling the well-established categorical direct/collateral distinction and confining our reasoning to a case-by-case approach invites incoherence and confusion. Of course, we cannot rule out that there may be other apparently collateral consequences that are so severe and automatic that they are, like deportation, "ill suited" to the framework. As we discuss in the following section, however, civil denaturalization is not such a consequence. And as a general matter we adhere to our pre-*Padilla* precedents in which the collateral/direct distinction is presumed to apply.

### B.    The Framework's Applicability to Denaturalization

Accepting the direct/collateral framework's general validity, we now look to whether it applies to civil denaturalization. Farhane and the dissent argue that it does not. They analogize denaturalization to deportation, and, citing *Padilla*, argue that it is similarly "ill suited" to the direct/collateral framework.

The *Padilla* Court emphasized two factors when concluding that the distinction did not apply to deportation: deportation's severity and its automatic character.[33] In *Padilla* and *Chaidez*, the Court emphasized deportation's "particularly severe" character,[34] and the government does not dispute that, like deportation,

---

[33] *See Chaidez*, 568 U.S. at 352. Farhane also argues that the Court considered the professional recognition of the duty to warn of the risk of deportation. The Court's discussion of professional consensus, however, was limited to the *Strickland* factors, which are not relevant in this analysis. *See Padilla*, 559 U.S. at 366-67.

[34] *Padilla*, 559 U.S. at 365; *Chaidez*, 568 U.S. at 352.

denaturalization is serious.[35] Severity alone, however, is not enough to equate the two proceedings. *Padilla* emphasized that it was deportation's "close connection to the criminal process" that made it "uniquely difficult to classify as either a direct or a collateral consequence."[36] So, with the severity of denaturalization undisputed, we turn to the *Padilla* Court's analysis of deportation's nearly automatic relationship to conviction.

*Padilla* concluded that the direct/collateral framework was not applicable because deportation, while technically a civil proceeding, was "nevertheless intimately related to the criminal process."[37] This intimate connection was the result of "recent changes in our immigration law" that made "removal nearly an automatic result for a broad class of noncitizen offenders."[38] The Court noted that an alien was rendered deportable by the fact of his conviction.[39] Thus, it was the guilty plea itself that rendered Padilla deportable. This automatic relationship between conviction and deportation made it "uniquely difficult to classify [deportation] as either a direct or a collateral consequence," and so the Court concluded that the Sixth Amendment applied to warning of the risk of deportation without regard to the direct/collateral threshold distinction.[40]

---

[35] *See Knauer v. United States*, 328 U.S. 654, 659 (1946) (stating that "denaturalization, like deportation, may result in the loss of all that makes life worth living" (quotation marks omitted)).

[36] *Padilla*, 559 U.S. at 366.

[37] *Id.* at 365.

[38] *Id.* at 366.

[39] *See id.* at 368 (citing 8 U.S.C. § 1227(a)(2)).

[40] *Id.* at 366.

Civil denaturalization, by contrast, lacks this "automatic" relationship to the guilty plea. It depends not on the fact of conviction but on the individual's actions before and at the time of naturalization.[41] It can occur with or without a criminal conviction. While Farhane's conviction might alleviate the government's evidentiary burden, the government could have sought his denaturalization by proving his substantive conduct, without waiting for, relying on, or even referencing his criminal conviction. Civil denaturalization is therefore not "intimately related to the criminal process," and applying the direct/collateral framework presents no particular difficulty.[42]

## C.    Denaturalization as a Collateral Consequence

Having recognized the direct/collateral framework's ongoing vitality and applicability to this case, we now reach the "threshold question" for an ineffective assistance claim based on a failure to warn. That is, whether the unwarned of event—here, denaturalization—was a direct or collateral consequence of the guilty plea.[43]

---

[41] This is true of denaturalization under 8 U.S.C. § 1451(a), commonly referred to as "civil denaturalization." In contrast, "criminal denaturalization," governed by § 1451(e), provides that when a person is convicted of unlawfully naturalizing in violation of 18 U.S.C. § 1425, the "the court in which such conviction is had shall thereupon revoke, set aside, and declare void the final order admitting such person to citizenship, and shall declare the certificate of naturalization of such person to be canceled." *See* Cassandra Burke Robertson & Irina D. Manta, *(Un)civil Denaturalization*, 94 N.Y.U. L. Rev. 402, 407 (2019) (describing the two kinds of denaturalization). Our holding in this case is limited to civil denaturalization.

[42] *Padilla*, 559 U.S. at 365.

[43] *Chaidez*, 568 U.S. at 349.

A consequence is collateral if it does not "directly flow[] from the judgment," even if it "depend[s] on a conviction of [a] crime."[44] We have described as collateral a variety of results not directly connected to criminal proceedings, such as losing certain civil rights, including the right to vote; becoming ineligible to serve in the armed forces; and being collaterally estopped from raising defenses in civil cases.[45] At the same time, the Supreme Court, while never "attempt[ing] to delineate the world of 'collateral consequences,'" has noted that "effects of a conviction commonly viewed as collateral include civil commitment, civil forfeiture, sex offender registration, disqualification from public benefits, and disfranchisement."[46] In the closely related Fifth Amendment context, we have defined direct consequences as those that "have a definite, immediate and largely automatic effect on the range of the defendant's punishment," with all other consequences being collateral.[47]

In light of this precedent, Farhane's pending denaturalization is plainly a collateral consequence of his guilty plea. Civil denaturalization is a separate proceeding that may or may not occur following the plea.[48] The government exercises considerable discretion in bringing denaturalization cases, as does the district court

---

[44] *Parrino*, 212 F.2d at 921.

[45] *See id.* at 922; *Del Rosario*, 902 F.2d at 59.

[46] *Chaidez*, 568 U.S. at 349 n.5.

[47] *Youngs*, 687 F.3d at 60 (quotation marks omitted); *cf. id.* at 62 (noting that the "Sixth Amendment responsibilities of counsel to advise of the advantages and disadvantages of a guilty plea are greater than the responsibilities of a court under the Fifth Amendment").

[48] *See* 8 U.S.C. § 1451(a) (empowering the government to "institute proceedings in any district court of the United States in the judicial district in which the naturalized citizen may reside . . . for the purpose of revoking and setting aside the order admitting such person to citizenship").

in evaluating the evidence.[49]  As noted earlier, denaturalization also does not require a conviction; indeed, the government could seek to denaturalize Farhane without relying on his guilty plea.  Instead, it turns on the defendant's actual conduct, which the government must establish by "clear, unequivocal, and convincing evidence."[50]  Thus, denaturalization does not "directly flow[] from" a conviction.[51]  And while Farhane's guilty plea likely prevents him from disputing his eligibility for denaturalization, collateral estoppel alone does not transform a collateral consequence into a direct one.[52]

As a collateral consequence, denaturalization is "categorically removed from the scope of the Sixth Amendment."[53]  Accordingly, as a categorical matter, Farhane's counsel was not ineffective for failing to warn him of the risk of denaturalization in advising him on his guilty plea.  For the same reason, Farhane's counsel was not ineffective for failing to warn him of the risk of deportation.  Farhane can only be deported if he is first denaturalized.  As a possible consequence of a collateral proceeding, the risk of deportation in this case is even further removed from the direct consequences of Farhane's conviction.  Therefore, Farhane cannot pass the threshold to establish that he suffered ineffective assistance of counsel, and the

---

[49] *See* Amber Qureshi, *The Denaturalization Consequences of Guilty Pleas*, 130 Yale L.J. F. 166, 169-71 (2020) (describing the history of denaturalization and noting its historical rarity); *see also Youngs*, 687 F.3d at 63 (emphasizing the importance of the court's power to independently evaluate the evidence in the direct/collateral analysis).

[50] *Kungys v. United States*, 485 U.S. 759, 781 (1988) (quotation marks omitted).

[51] *Parrino*, 212 F.2d at 921.

[52] *See id.* at 922.

[53] *Chaidez*, 568 U.S. at 349 (quotation marks omitted).

district court's denial of his habeas petition to withdraw his guilty plea should not be disturbed.

Farhane's counterarguments are not persuasive. He contends that his denaturalization and subsequent deportation are direct consequences of his guilty plea. They are direct, he claims, because his guilty plea prevents him from contesting the grounds for his denaturalization. As discussed above, however, collateral estoppel guaranteeing the outcome of a particular proceeding does not make that proceeding "direct." Holding otherwise would render a wide variety of civil proceedings direct, vastly expanding the Sixth Amendment's scope.[54] Farhane attempts to limit this expansion by emphasizing the severity of denaturalization. But many collateral consequences are severe, including disenfranchisement, the loss of the right to travel abroad, the revocation of a driver's license, civil commitment, and sex offender registration.[55] Once the direct/collateral framework is applied, whether or not a consequence is collateral does not turn on its severity.[56]

Farhane also argues that *Padilla* requires warning in his case because the government's ultimate intention is to deport him. He is wrong. The government's motive, whatever it may be, does not transform denaturalization into a direct consequence of his plea. Because denaturalization is collateral, everything thereafter to which it is a precondition is also collateral. Thus *Padilla*, which requires warnings of deportations arising automatically from guilty pleas, has

---

[54] *See Parrino*, 212 F.2d at 922.

[55] *See Chaidez*, 568 U.S. at 349 n.5 (listing examples); *Del Rosario*, 902 F.2d at 59 (collecting cases).

[56] *See Youngs*, 687 F.3d at 60 (describing the relevant considerations).

no purchase here, where the possibility of deportation is predicated on a collateral consequence.

Finally, Farhane and the dissent both suggest that it would be incongruous to hold that the Sixth Amendment does not apply to warnings about denaturalization because it would mean that naturalized citizens, who are not entitled to a warning about a plea that could lead to deportation down the road, are less protected than noncitizens, who must be warned if their plea exposes them to deportation. But this compares apples to oranges: Congress chose to treat the civil denaturalization of citizens differently from the removal of aliens by not tying denaturalization to a criminal conviction. It is unsurprising that a competent counsel's obligations would differ under these different statutory schemes.

Farhane's possible denaturalization and possible subsequent deportation are collateral consequences of his guilty plea. The Sixth Amendment does not require competent counsel to warn Farhane of these risks. Thus, Farhane's ineffective assistance of counsel claim flounders at the threshold question of the Sixth Amendment's applicability. Accordingly, we affirm the district court without needing to apply *Strickland*.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

**20-1666**
*Farhane v. United States*

WALKER, *Circuit Judge*, concurring:

I write separately, in response to Judge Carney's dissent, to explain that Farhane's ineffective assistance claim would also fail under the *Strickland* analysis. To establish ineffective assistance, a defendant must show that his "counsel's representation fell below an objective standard of reasonableness" and that he suffered prejudice as a result.[1] Judge Carney would hold that defense counsel acted unreasonably in failing to warn Farhane of the risk of denaturalization when Farhane pleaded guilty in 2006. I disagree.

The first prong—whether counsel acted unreasonably—"is necessarily linked to the practice and expectations of the legal community."[2] This is because "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms."[3] Therefore, "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable."[4] In interpreting such standards, however, we must recognize that some of them "may represent only the aspirations of a bar group rather than an empirical assessment of actual practice."[5] Ultimately, the "courts must judge the reasonableness of counsel's challenged conduct on the facts of the

---

[1] *Strickland*, 466 U.S. at 688, 692; *see United States v. Pinhasov*, 762 F. App'x 43, 46 (2d Cir. 2019) (quoting the *Strickland* test).

[2] *Padilla*, 559 U.S. at 366.

[3] *Strickland*, 466 U.S. at 688.

[4] *Id.* at 689.

[5] *Padilla*, 559 U.S. at 377 (Alito, J., concurring).

particular case, viewed as of the time of counsel's conduct,"[6] and without the benefit of hindsight.

In this case, Farhane's lawyer did not act unreasonably. The record suggests that, while the lawyer knew that Farhane was naturalized, he did not know (1) when Farhane was naturalized in relation to the crimes to which Farhane later pleaded guilty and (2) whether Farhane thus might have lied during his naturalization. What is more, in 2006, when Farhane entered his plea, civil denaturalization was extremely rare. The government brought fewer than 150 civil denaturalization cases in the forty-four years between 1967 and 2012—just over three cases per year across the entire country.[7] And Farhane has not cited any authority that admonished lawyers to advise clients of the risk of denaturalization. Instead, the contemporaneous ABA standards spoke generally of "basic immigration consequences," which would usually only apply to non-citizens, without mentioning denaturalization.[8] General invocations of "immigration consequences" are not enough to establish that, *in 2006*, competent counsel should have warned a client he knew to be naturalized, but not when or under what circumstances, of the rare possibility of civil denaturalization, much less any possibility of deportation.

---

[6] *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000).

[7] Qureshi, 130 Yale L.J. F. at 170.

[8] Standards for Criminal Justice, Pleas of Guilty 14-3.2, 14-3.2 cmt. (Am. Bar Ass'n, 3d ed. 1999) (stating that "counsel should be familiar with basic immigration consequences that flow from different types of guilty pleas"); *see also* N.Y. State Defs. Ass'n, Client Advisory Bd., Client-Centered Representation Standards 17 (July 25, 2005).

Moreover, because in 2006 the direct/collateral distinction presented a "chink-free wall,"[9] a lawyer at that time would have believed that constitutionally competent representation did not require warnings of collateral consequences. Thus, it is even less likely that in 2006 competent criminal defense counsel would have felt obliged to investigate the obscure and remote possible collateral consequences of the guilty plea. Of course, Farhane's judgment upon his 2006 guilty plea did not become final until 2011, so *Padilla*, decided in 2010, is applicable law in this case. Nevertheless, at the time of the guilty plea, his attorney could not have reasonably foreseen the possible second-order consequences of a decision that would be issued four years later. *Strickland* has never required an attorney to gaze into a crystal ball.

Farhane's lawyer did not know at the time that Farhane was at risk of denaturalization; he was not put on notice of the risk by the legal community's standards; and, if it had somehow occurred to him, despite denaturalization being a collateral consequence of a guilty plea, he would have reasonably believed that no further investigation or warning was constitutionally required. In this context, I cannot conclude that his actions were objectively unreasonable. Accordingly, I would also affirm the district court on the basis that counsel was not ineffective under *Strickland*'s unreasonableness prong.

---

[9] *Chaidez*, 568 U.S. at 352.

CARNEY, *Circuit Judge*, dissenting:

Abderrahmane Farhane is a naturalized U.S. citizen who immigrated to this country nearly three decades ago, settling here and raising a family. Because in 2006 he pleaded guilty to criminal charges—charges for which he then duly served over ten years in prison—Farhane can expect to lose his U.S. citizenship in denaturalization proceedings that the government has already filed against him. When those proceedings end, it is a "virtual certainty" that he will be deported. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1211 (2018).

In a petition brought under 28 U.S.C. § 2255, he now plausibly maintains that in the plea-bargaining process, his defense counsel did not advise him that his guilty plea could carry any adverse immigration consequences at all. Farhane urges that the legal representation he received was thus ineffective under the Sixth Amendment, relying on *Padilla v. Kentucky*, 559 U.S. 356 (2010). In *Padilla*, the Supreme Court held that Jose Padilla's right to effective assistance required that counsel warn him of any deportation risk arising from his 2002 guilty plea. 559 U.S. at 374; *see Padilla v. Commonwealth*, 381 S.W.3d 322, 324 (Ky. Ct. App. 2012) (setting forth the timeline of Padilla's plea and conviction). Accordingly, Farhane seeks vacatur of his guilty plea, sentence, and conviction. A panel of this Court granted a certificate of appealability.

The Majority rejects Farhane's petition, concluding that his expected denaturalization—which will in turn lead to deportation—is a "collateral" consequence of his conviction, and so his counsel bore no obligation to alert him to this risk of pleading guilty. As I understand the Majority, even today a defendant has no right to be warned by counsel that a guilty plea could lead to *any* adverse immigration consequences, unless the client's circumstances exactly match those in *Padilla*—that is, the client must be a noncitizen whose guilty plea will lead to immediate removability. In reaching this conclusion, the Majority embraces what in my view is an erroneously

restrictive interpretation of *Padilla* and incorrectly circumscribes the advice that a criminal defendant is constitutionally entitled to receive.

In *Padilla*, as just summarized, the Supreme Court ruled that a noncitizen received constitutionally ineffective assistance when his criminal defense counsel did not advise him that his guilty plea to a state drug offense made him subject to automatic deportation. 559 U.S. at 360. The Kentucky Supreme Court, having labeled deportation a "collateral" consequence of a guilty plea, recognized no basis for an ineffective assistance claim and rejected Padilla's habeas petition. *Id.* at 364–65. Identifying error in the state court's analysis, the Supreme Court acknowledged that lower courts had long used a distinction between "direct" and "collateral" consequences to categorize the array of results flowing from a criminal conviction, but in the context of Padilla's Sixth Amendment claim it declined to apply the distinction to deportation. *Id.* Deportation is a "particularly severe penalty," it stressed, and observed that developments in immigration law since 1990 made deportation "nearly an automatic result for a broad class of noncitizen offenders." *Id.* at 365–66 (internal quotation marks omitted). It cautioned that deportation's "close connection to the criminal process" made it "uniquely difficult to classify as either a direct or a collateral consequence," and instructed that the dichotomy was "ill suited" to assessing the validity of a criminal defendant's Sixth Amendment challenge involving the risk of deportation. *Id.* at 366. While declining to decide whether the direct/collateral distinction can, in other cases, "define the scope of constitutionally 'reasonable professional assistance' required" under *Strickland v. Washington*, 466 U.S. 668, 689 (1984), it proceeded to apply *Strickland* to determine that Padilla's counsel had fallen below an objectively reasonable standard in 2002 when he failed to advise Padilla of the risk of deportation triggered by his guilty plea. *Padilla*, 559 U.S. at 365. Criminal defendants, the Court said, may care deeply about remaining in the United States, and Padilla was constitutionally entitled to be advised of the severe risk of being removed. *Id.* at 368. It remanded for a determination

whether Padilla met *Strickland*'s second prong by showing prejudice from the ineffective assistance he received. *Id.* at 375.

In my view, the direct/collateral dichotomy that the *Padilla* Court found inapt in the context of deportation is similarly ill-suited to evaluating Farhane's Sixth Amendment claim, which rests on a risk of denaturalization of which he was never informed. Regardless of the direct/collateral dichotomy's intuitive appeal and practical utility with respect to the many other types of consequences that a conviction may carry, denaturalization shares with deportation the severity and entanglement with the criminal process that the *Padilla* Court relied on to conclude that risk of deportation was a poor fit for consideration under that framework. What's more, denaturalization itself risks a related deportation, underscoring the close parallels between Farhane's and Padilla's Sixth Amendment claims.

The Supreme Court long ago recognized that stripping an individual of citizenship "is an extraordinarily severe penalty." *Klapprott v. United States*, 335 U.S. 601, 612 (1949) (plurality opinion). In line with that recognition, it has cautioned that "denaturalization, like deportation, may result in the loss of all that makes life worth living." *Knauer v. United States*, 328 U.S. 654, 659 (1946) (internal quotation marks omitted). And every naturalized citizen who, like Farhane, pleads guilty to pre-naturalization criminal conduct has created for himself a serious risk of denaturalization based on the theory that he acquired his citizenship illegally or by willful misrepresentation. Indeed, the facts established through a guilty plea will be treated as conclusive in a subsequent denaturalization proceeding. *See Maietta v. Artuz*, 84 F.3d 100, 102 n.1 (2d Cir. 1996). Courts in such denaturalization proceedings have "no discretion to excuse the conduct" in question, *Fedorenko v. United States*, 449 U.S. 490, 517 (1981), and so the subjects of these proceedings should be prepared for the prospect of deportation after denaturalization. And deportation, the Supreme Court has observed, is "the equivalent of banishment or exile." *Delgadillo v. Carmichael*, 332 U.S.

3

388, 390–91 (1947); *see also Jordan v. De George*, 341 U.S. 223, 232 (1951) (Jackson, J., dissenting) (describing deportation as a "life sentence of banishment").

Farhane's guilty plea thus exposed him, and continues to expose him, to serious risks of denaturalization and of deportation. In light of the Supreme Court's reasoning in *Padilla* and in view of these additional considerations, I would conclude that the direct/collateral dichotomy does not bar Farhane's Sixth Amendment challenge. I would reach the merits of his § 2255 claim. Applying the two-pronged *Strickland* test, I would rule that the failure of Farhane's counsel to advise him as to the risks of denaturalization and deportation in connection with his guilty plea was objectively unreasonable. Accordingly, I would vacate the district court's judgment dismissing Farhane's claim and remand to allow the district court to address in the first instance whether he was prejudiced by his counsel's deficient performance.

By too swiftly dismissing Farhane's arguments and too broadly reembracing the direct/collateral dichotomy's application to Sixth Amendment challenges, the Majority mistakenly constricts *Padilla*. I agree with the Majority that in neither the Sixth nor the Fifth Amendment contexts does *Padilla* require a wholesale abandonment of the direct/collateral dichotomy. In my view, however, the Court's reasoning and commentary in *Padilla* all but mandate that we reach the same result as to denaturalization as it did regarding deportation. A key result of the Majority's decision, I fear, is that many naturalized citizen criminal defendants will be left ignorant now, as Farhane was in 2006, of the grave immigration risks that attach to their guilty pleas. Under the Majority's approach, those defendants will have no recourse. In my view, and as I believe *Padilla* requires, the Sixth Amendment demands more.

For these reasons and others discussed below, I respectfully dissent.

4

**I.    Denaturalization cannot be dismissed as a merely "collateral" consequence in assessing a Sixth Amendment ineffective assistance claim.**

An individual serving a sentence for a federal crime may move to vacate the sentence on the ground that "the sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a).[1] Under the Sixth Amendment, a criminal defendant is entitled to the effective assistance of counsel "at 'critical stages of a criminal proceeding,' including when he enters a guilty plea." *Jae Lee v. United States*, 582 US. 357, 363 (2017) (quoting *Lafler v. Cooper*, 566 U.S. 156, 165 (2012)). The Supreme Court instructed in *Strickland v. Washington* that a defendant's failure to receive such assistance, to his prejudice, is grounds for awarding habeas relief. *See* 466 U.S. at 697–98.

Ordinarily, we evaluate a defendant's ineffective assistance claim by applying the two-pronged approach set forth in *Strickland*: the court evaluates, first, whether counsel's performance fell below an objective standard of reasonableness, and second, whether the defendant was prejudiced as a result. *See id*. at 687–88. The Majority does not apply *Strickland*, however, because it holds that Farhane's claim challenges a "collateral" consequence of his conviction, and that the Sixth Amendment's guarantee of effective counsel therefore has no role to play. That holding is incorrect for several reasons.

    A.    *Padilla* requires reconsidering whether the direct/collateral dichotomy applies to denaturalization.

This case appears to be the first in the thirteen years since *Padilla* in which our Court has, in a published decision, considered the direct/collateral dichotomy in the

_____

[1] Relief under this section is available to a "prisoner in custody under sentence of a court," but a petitioner who is subject to supervised release when he files a petition may be considered "in custody" for purposes of section 2255(a). *See Scanio v. United States*, 37 F.3d 858, 860 (2d Cir. 1994). Farhane was on supervised release when he filed his section 2255(a) motion and is thus eligible for relief.

Sixth Amendment context.[2] The distinction itself has been subject to varying interpretations, but broadly has turned on the consequence's causal proximity to the conviction. In the context of a due process challenge to a guilty plea's voluntariness, for example, we explained that "direct consequences [are] those that have a definite, immediate and largely automatic effect on the range of the defendant's punishment, and any other consequence is merely collateral." *United States v. Youngs*, 687 F.3d 56, 60 (2d Cir. 2012) (internal quotation marks omitted). In a pre-*Padilla* case that the Majority cites, meanwhile, we called collateral any consequence that "does not directly flow from the judgment, even if it depends on a conviction of a crime." Maj. Op. at 15 (internal quotation marks omitted) (quoting *United States v. Parrino*, 212 F.2d 919, 921 (2d Cir. 1954)). No matter the approach taken,[3] neither the Majority nor the government

---

[2] Not long ago, in a summary order, we expressly declined to address whether "denaturalization is a 'collateral' consequence of a criminal conviction that falls outside the ambit of the Sixth Amendment right to counsel"; we instead affirmed on the merits a district court's rejection of an ineffective assistance claim that was based on exposure to denaturalization. *See United States v. Nunez*, 844 F. App'x 443, 444 (2d Cir. 2021). In addition, in *Santiago v. Laclair*, we affirmed the denial of habeas relief to a state prisoner who claimed, based on *Padilla*, that his counsel was ineffective for failing to advise that a sentence for a new crime would run consecutively to the non-discharged portion of a sentence for a prior felony. 588 F. App'x 1, 2–4 (2d Cir. 2014). In dictum, the *Santiago* Court characterized *Padilla*'s holding as "narrow" and "limited specifically to the unique penalty of deportation," based on deportation's severity, its impact on families, and the observation that "preserving the client's right to remain in the United States may be more important to the client than any potential jail sentence." *Id.* at 3–4 (quoting *Padilla*, 559 U.S. at 368) (internal quotation marks and alterations omitted). Neither decision is precedential nor speaks to the applicability of the direct/collateral framework in this case.

[3] The Supreme Court has acknowledged—and declined to resolve—the "disagreement among the courts over how to distinguish between direct and collateral consequences." *See Padilla*, 559 U.S. at 364 n.8. Some courts seem to consider "direct" only those consequences "within the sentencing authority of the . . . trial court." *Id.* at 364. On the flip side of the coin, consequences that require the actions of "another agency over which the trial judge has no control," or those that automatically apply by operation of law, might be deemed "collateral." *See, e.g., United States v. Delgado-Ramos*, 635 F.3d 1237, 1239 (9th Cir. 2011) (noting the two descriptions of "collateral" consequences and rejecting the "operation of law" standard). In the

disputes that consequences that courts have labeled "collateral" can be just as
devastating as those called "direct."[4] Further, even those consequences that courts have

---

Fifth Amendment context, some courts have concluded that, even when a consequence is "direct," a court's failure to warn of such a consequence before accepting a plea does not violate due process if that particular consequence is "remedial and civil rather than punitive." *See Mitschke v. State*, 129 S.W.3d 130, 135 (Tex. Crim. App. 2004).

Indeed, courts have drawn differing boundaries between direct and collateral consequences for use in assessing the Fifth Amendment's due process requirements (that the trial court ensure a defendant's guilty plea is "intelligent and voluntary," *Youngs*, 687 F.3d at 59) and in assessing the Sixth Amendment's guarantee of effective assistance (where counsel's role is, in part, to advise in the "negotiation of a plea bargain," *Padilla*, 559 U.S. at 373). *See infra* Part I.A.3 and note 9. Some commentators have traced the roots of the direct/collateral distinction back fifty years to the Supreme Court's Fifth Amendment decision in *Brady v. United States*, 397 U.S. 742 (1970). *See, e.g.*, Jenny Roberts, *The Mythical Divide Between Collateral and Direct Consequences of Criminal Convictions: Involuntary Commitment of "Sexually Violent Predators"*, 93 MINN. L. REV. 670, 684–85 (2008). In considering there how to assess the voluntariness of guilty pleas, the *Brady* Court adopted Judge Tuttle's language about direct consequences:

> A plea of guilty entered by one fully aware of the *direct consequences*, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Brady*, 397 U.S. at 755 (emphasis added) (alteration omitted) (quoting *Shelton v. United States*, 246 F.2d 571, 572 n.2 (5th Cir. 1957) (en banc)). The Court did not otherwise address the idea of a "direct consequence" or explore the notion of "collateral" consequences, but the array of cases discussed in this dissent demonstrates the weighty legal significance with which these words have since been imbued.

[4] Consequences that courts have deemed "collateral" include revocation of parole, civil commitment, consecutive rather than concurrent sentencing, disenfranchisement, disqualification from public benefits, deportation, dishonorable discharge from the armed services, and loss of business or professional licenses. Gabriel J. Chin & Richard W. Holmes, Jr., *Effective Assistance of Counsel and the Consequences of Guilty Pleas*, 87 CORNELL L. REV. 697, 705–06 (2002).

described as "collateral"—such as deportation—can be unavoidably "enmeshed [in] criminal convictions." *Padilla*, 559 U.S. at 365–66.

As described above, in *Padilla* the Supreme Court declined to categorize the "risk of deportation" as either direct or collateral before proceeding to assess the petitioner's ineffective assistance claim under *Strickland*. 559 U.S. at 364–66. Rather, stressing that deportation was a "severe penalty" and that it was "nearly an automatic result for a broad class of noncitizen offenders," the Court held that "[t]he collateral versus direct distinction is . . . ill suited to evaluating a *Strickland* claim concerning the specific risk of deportation." *Id.* at 365–66 (internal quotation marks omitted). It ultimately concluded that Padilla had sufficiently alleged that the counsel he received was constitutionally deficient. *Id.* at 374.

In so finding—as it soon after confirmed in *Chaidez v. United States*—the Court disclaimed strict allegiance to the proposition that "the Sixth Amendment does not require attorneys to inform their clients of a conviction's collateral consequences, including deportation." 568 U.S. 342, 350 (2013). Rather, the *Padilla* Court observed that, in contrast to the lower courts, which were "almost unanimous[]" on the issue, *id.*, the Supreme Court itself had "never applied a distinction between direct and collateral consequences to define the scope of constitutionally reasonable professional assistance required under *Strickland*," *Padilla*, 559 U.S. at 365 (internal quotation marks omitted). And it expressly declined to consider "[w]hether that distinction is appropriate" in cases involving consequences other than deportation. *Id.* It also did not explore the boundaries of the dichotomy, offering no view about which consequences should be considered "collateral" and which "direct."

In declining to apply the direct/collateral framework to determine the availability of an ineffective assistance claim, *Padilla* "breach[ed] the previously chink-free wall between direct and collateral consequences," *Chaidez*, 568 U.S. at 352–53, and thus marked a "major upheaval in Sixth Amendment law," *Padilla*, 559 U.S. at 383 (Alito, J.,

concurring). Commentators described the decision's effects as "seismic." *See* McGregor Smyth, *From "Collateral" to "Integral": The Seismic Evolution of* Padilla v. Kentucky *and Its Impact on Penalties Beyond Deportation*, 54 HOW. L. J. 795, 798 (2011).

In the decade since, many courts have responded by closely reexamining their Sixth Amendment precedents and sometimes limiting application of the direct/collateral distinction in the context of a criminal defendant's ineffective assistance claim. *See, e.g., Alexander v. State*, 772 S.E.2d 655, 659 (Ga. 2015) (overruling its pre-*Padilla* law and requiring that ineffective assistance claims be evaluated under *Strickland* regardless "whether a guilty plea gives rise to a direct or collateral consequence"); *Commonwealth v. Thompson*, 548 S.W.3d 881, 890 (Ky. 2018) (recognizing that, after *Padilla*, "severe and definite consequences implicating effective assistance of counsel may be ill-suited to classification as either direct or collateral but should be addressed in a *Padilla*-type analysis"); *Commonwealth v. Pridham*, 394 S.W.3d 867, 879 (Ky. 2012) (rejecting the Commonwealth's "minimalist reading of *Padilla*" that would "implicate[] no collateral consequence but deportation"); *cf. United States v. Tuakalau*, 562 F. App'x 604, 609 n.4 (10th Cir. 2014) (summary order) (suggesting that "*Padilla* may have called the distinction between direct and collateral consequences into doubt"); *Taylor v. State*, 698 S.E.2d 384, 387 (Ga. Ct. App. 2010) ("*Padilla* . . . calls into question the application of the direct versus collateral consequences distinction in the context of ineffective assistance claims.").[5]

---

[5] Other courts, to be sure, have after examination decided to maintain the distinction's application at least in some particular contexts. *See, e.g., Commonwealth v. Thompson*, 548 S.W.3d 881, 893 n.10 (Ky. 2018) (noting that "some states have concluded that counsel's failure to inform the client of sex offender registration cannot be ineffective assistance" (citing *State v. Trotter*, 330 P.3d 1267, 1269 (Utah 2014) and *Taylor v. State*, 887 N.W.2d 821, 826 (Minn. 2016))); *Kennedy v. Kohnle*, 810 S.E.2d 543, 548 n.4 (Ga. 2018) (collecting cases, and observing "that there is a split among other jurisdictions as to whether to extend *Padilla* to advice about parole eligibility"); *State v. LeMere*, 879 N.W.2d 580, 588–99 (Wis. 2016) (evaluating Wisconsin's civil commitment statute in light of *Padilla* and concluding that the possibility of civil commitment

Unlike those courts, the Majority accepts with only a summary analysis the notion that the direct/collateral framework applies to the particular consequence of denaturalization. Indeed, the Majority here doubles down on the direct/collateral distinction, declaring that it continues to apply uniformly, subject only to the adequacy of counsel's advice on the particular consequence addressed in *Padilla*: the risk of deportation. Setting aside its resistance to examining whether the framework should continue to apply more generally, *see supra* note 5, the Majority's analysis here as to Farhane's submissions is flawed in several respects. *First*, it misreads the Supreme Court's ruling in *Chaidez*; *second*, it too readily accepts pre-*Padilla* precedent as still applicable; and *third*, it obscures the important distinction between our Fifth Amendment decisions on the court's obligation to ensure a voluntary and knowing plea, and our Sixth Amendment decisions on counsel's obligation to provide meaningful advice.

### 1. Chaidez *is limited to* Padilla*'s retroactivity.*

Two years after handing down *Padilla*, the Supreme Court held in *Chaidez* that *Padilla* "announced a new rule" that was not previously "apparent to all reasonable jurists"; the rule therefore did not apply retroactively to convictions that had already become final on direct review. 568 U.S. at 354 (internal quotation marks omitted). Now invoking *Chaidez*, the Majority suggests that the Supreme Court has endorsed the application of the direct/collateral distinction in all cases not involving deportation. In this, they err.

---

for people convicted of sexually violent offenses is a collateral consequence for which counsel has no duty to advise). The lack of uniformity in response, however, only underscores that, after *Padilla*, courts should seriously examine the direct/collateral framework's applicability to the consequences at issue in a given case.

The Majority cites *Chaidez* for the sweeping proposition that "collateral consequences are 'categorically removed from the scope of the Sixth Amendment.'" Maj. Op. at 6–7 (quoting *Chaidez*, 568 U.S. at 349). But in doing so, it takes the quoted language out of context: *Chaidez* described the analysis in *Padilla* as "consider[ing] a threshold question: Was advice about deportation 'categorically removed' from the scope of the Sixth Amendment right to counsel[?]" *Chaidez*, 568 U.S. at 349 (quoting *Padilla*, 559 U.S. at 366). The *Chaidez* Court then described *Padilla* as holding that advice about deportation was *not* categorically removed from Sixth Amendment protection. *Id.* at 353 (commenting that "*Padilla* . . . rejected that categorical approach—and so made the *Strickland* test operative—when a criminal lawyer gives (or fails to give) advice about immigration consequences").

The Majority also relies on *Chaidez* for the proposition that the direct/collateral dichotomy is "one of the most widely recognized rules of American law." Maj. Op. at 9 (quoting *Chaidez*, 568 U.S. at 351). The *Chaidez* Court, however, offered this characterization only to establish what the legal landscape looked like pre-*Padilla*. It explained that when it decided *Padilla*—abandoning application of the dichotomy in the context of deportation—it thus "altered the law of most jurisdictions." *Chaidez*, 568 at 352. Indeed, *Padilla* announced a "new rule"—a new Sixth Amendment rule that did not qualify for retroactive application. *Id.* at 348–50. In neither *Padilla* nor *Chaidez* did the Court give a general endorsement to applying the direct/collateral distinction as to consequences other than deportation. Nor did it otherwise "delineate the world of 'collateral consequences'" as to which the Sixth Amendment would have no application. *Id.* at 349 n.5. The Majority thus reads *Chaidez* incorrectly when it suggests that *Chaidez* endorses the direct/collateral distinction here, or in any other particular circumstance.

11

*2. The Majority erroneously relies on our pre-*Padilla *Sixth Amendment cases and ignores developments since* Padilla.

Second, the Majority relies heavily on caselaw of this Court that either preceded *Padilla, see, e.g., United States v. Santelises*, 509 F.2d 703, 704 (2d Cir. 1975) (per curiam), *abrogated by Padilla*, 559 U.S. 356; *Parrino*, 212 F.2d at 921,[6] or caselaw from other courts that, while more recent, does not address denaturalization and provides, at best, limited support to the Majority's position, *see, e.g., United States v. Reeves*, 695 F.3d 637, 640 (7th Cir. 2012) (considering whether failure to advise on enhanced sentencing for future criminal conduct can give rise to an ineffective assistance of counsel claim).

In *Parrino*, a 1954 decision cited by the Majority, we observed that criminal convictions can carry consequences like deportation that have "terrific impact" but that do not "directly flow[]" from a judgment, and we suggested that defendants have no constitutional right to be apprised by counsel of such collateral consequences before entering a guilty plea, no matter how "surprised" they may be by those consequences. 212 F.2d at 921–22. There, a panel majority denied the vacatur motion, seeing no basis to hold that "defendants are subjected to manifest injustice, if held to their plea, merely because they did not understand or foresee such collateral consequences."[7] But the Supreme Court's ruling in *Padilla* surely supervenes the *Parrino* majority's ruling; indeed, the facts are nearly identical, and as discussed above, *Padilla* was unequivocal in holding that deportation cannot be classified as either a "direct" or "collateral" consequence of a conviction. *Padilla*, 559 U.S. at 365–66. The Majority's reasoning from

---

[6] The Majority also cites an out-of-circuit decision that spoke broadly about different types of collateral consequences, but that decision, too, was abrogated by *Padilla*. *See United States v. Del Rosario*, 902 F.2d 55, 59 (D.C. Cir. 1990), *abrogated by Padilla*, 559 U.S. 356.

[7] The dissenting judge in *Parrino* would have granted relief, and he described the sentence as follows: "For all practical purposes, the court sentenced [Parrino] to serve (a) two years in jail and (b) the rest of his life in exile." 212 F.2d at 924 (Frank, J., dissenting).

12

our Circuit's dated precedent therefore rests on a much shakier foundation than it perhaps acknowledges.

Further, while the Majority takes issue with my observation that many courts have responded to *Padilla* by "reexamining their Sixth Amendment precedents," the decisions by "several state supreme courts and a circuit court" that the Majority relies on to undermine this observation, Maj. Op. at 11, serve only to reinforce the point that, while the outcome may not be foretold, careful examination is now appropriate. Citing *Reeves*, 695 F.3d at 640, for example, the Majority asserts that it "align[s] [itself] with the Seventh Circuit in . . . affirming the [direct/collateral] distinction's threshold applicability to the Sixth Amendment." Maj. Op. at 10. But in *Reeves*, the Seventh Circuit carefully considered, and rejected, a defendant's ineffective assistance claim based on his counsel's failure to advise him that a guilty plea to one crime could trigger statutory sentencing enhancements after conviction for a second, later crime. 695 F.3d at 639–41. Before applying the direct/collateral framework, the court—prompted by *Padilla*—considered whether the framework applied at all: it compared the characteristics of sentencing enhancement to the "unique" and "automatic consequence" of deportation and concluded that its precedent addressing the counsel's duty to advise on an issue of future punishment for a second independent crime was not disturbed by *Padilla*. *Id.* at 639–40 (citing *Lewis v. United States*, 902 F.2d 576, 577 (7th Cir. 1990)). The circumstances and consequences presented there are far removed from those faced by Farhane.

The decision in *Taylor v. State*, 887 N.W.2d 821 (Minn. 2016), also cited by the Majority, similarly gives scant support for its view. In *Taylor*, the Minnesota Supreme Court considered whether warning of the post-conviction requirement to register as a predatory offender was part of the effective assistance required by the Sixth Amendment. *Id.* at 822. Much as the Seventh Circuit did in *Reeves,* the *Taylor* court first reexamined its pre-*Padilla* precedent in which it had "held . . . that the requirement to register as a predatory offender is a collateral consequence" not encompassed by the

13

duty to advise. *Id.* at 823–24 (citing *Kaiser v. State*, 641 N.W.2d 900, 907 (Minn. 2002)). After methodically comparing the features of predatory-offender registration to deportation, it concluded that, "because deportation is a more severe consequence than predatory-offender registration, . . . failure to advise a defendant about predatory-offender-registration requirements" does not violate a defendant's Sixth Amendment right to effective assistance. *Id.* at 824–26. Tellingly, it did not simply label the registration requirement as collateral and dismiss it as therefore unworthy of a freestanding Sixth Amendment analysis.

Finally, in its 2014 decision in *State v. Trotter*, the Supreme Court of Utah carefully considered whether, in light of *Padilla*, "Utah's sex offender registration requirement is sufficiently akin to deportation such that the direct-collateral divide is 'ill-suited' to dispose of Mr. Trotter's claims." 330 P.3d 1267, 1272 (Utah 2014). Just as the *Reeves* and *Taylor* courts had done, the *Trotter* court carefully compared a sex offender registration requirement to deportation, both in its severity and in its relationship to the criminal justice system. *Id.* at 1272–75. After extensively analyzing the effects of those requirements under the *Padilla* Court's reasoning, it concluded that the state's registration requirement was a separate, civil penalty; that it should not be removed from the "generally applicable direct-collateral dichotomy"; and that it did not carry with it an independent constitutional obligation to advise. *Id*.

To be clear, I do not claim that *Padilla* or *Chaidez*, seismic though they may have been, eradicated entirely the direct/collateral framework in the Sixth Amendment context. The dichotomy will continue to apply usefully in some—even many or most—cases, as demonstrated by the differing outcomes in the cases discussed in this section. But, regardless of their outcome, what all of these decisions show is that after *Padilla*, courts have abandoned automatic application of the direct/collateral framework to resolve ineffective assistance claims. Especially in the absence of any precedent from our court that squarely places denaturalization in the "collateral consequences"

14

category, I cannot join the Majority in so summarily applying the framework to dismiss Farhane's claim here. Nor, after studying the Majority's analysis, can I join in its result.

> 3. *The Sixth Amendment effective assistance obligations of counsel are broader than the Fifth Amendment Due Process obligations of courts accepting a guilty plea.*

Third, the Majority errs by relying on inapt precedents concerning a district court's obligation to ensure that a guilty plea is voluntary and intelligent under the Fifth Amendment's Due Process Clause and Federal Rule of Criminal Procedure 11. My colleagues suggest that in *United States v. Youngs*, 687 F.3d 56 (2d Cir. 2012), we squarely held that the blunt categorical distinction between direct and collateral consequences remains good law for all purposes, Fifth and Sixth Amendment duties alike, even after *Padilla*, except in the sole case of deportation risk. I disagree. That was not the question before the *Youngs* panel, and it could not have so held. Nor, contrary to the Majority's implication, have courts generally found to be coextensive the Fifth Amendment obligations of a court accepting a guilty plea and the Sixth Amendment obligations of counsel to give effective assistance.

The *Youngs* Court considered a Fifth Amendment challenge to the court's actions when accepting a guilty plea that entailed a possibility of eventual civil commitment.[8] *See Youngs*, 687 F.3d at 58–63. The Court "conclude[d] that advising of the possibility of

---

[8] Youngs pleaded guilty in 2008 to production and possession of child pornography. *Youngs*, 687 F.3d at 58. During the plea hearing, the court reviewed details of the plea agreement, including possible prison terms and supervised release provisions. *Id.* On direct appeal, Youngs argued that his due process rights were violated because the court failed to inform him that his guilty plea subjected him to possible civil commitment under the Adam Walsh Child Protection and Safety Act of 2006, 18 U.S.C. § 4248(a). *Youngs*, 687 F.3d at 58–59. Under the Act, the Attorney General or the Director of the Bureau of Prisons ("BOP") could certify an individual in BOP custody as a "sexually dangerous person." *Id.* If the government then was able to show by clear and convincing evidence, at a subsequent district court hearing, that the person was "sexually dangerous," the person would be committed to further custody until the court determined otherwise. *Id.*

civil commitment . . . does not fall within the scope of a district court's [Fifth Amendment] due process obligations because the concerns expressed by the Supreme Court in *Padilla* as to deportation in the context of adequate counsel under the Sixth Amendment do not apply to such a remote and uncertain consequence as civil commitment." *Id.* at 62. In so concluding, we went to some lengths to distinguish the court's Fifth Amendment Due Process obligations from counsel's Sixth Amendment obligations of counsel, explaining, "These Sixth Amendment responsibilities of counsel to advise of the advantages and disadvantages of a guilty plea are greater than the responsibilities of a court under the Fifth Amendment." *Id*. While discussing the general categories of collateral and direct consequences, the panel further "recognize[d] that *Padilla* may create some uncertainty as to the usefulness of categorizing *certain* consequences as either 'direct' or 'collateral,'" even in the Fifth Amendment context. *Id*. (emphasis in original). [9]

---

[9] We are not alone in recognizing that counsel's Sixth Amendment obligations are more extensive than the court's Fifth Amendment due process obligations. *See, e.g.*, *People v. Hughes*, 983 N.E.2d 439, 450–57 (Ill. 2012) (determining that a court's failure to inform a criminal defendant of the possibility of civil commitment could not give rise to a Fifth Amendment due process claim, but counsel's failure to advise of the same possibility might give rise to a Sixth Amendment claim). In *Hughes*, the Illinois Supreme Court interpreted *Padilla* to require consideration of the severity of an otherwise "collateral consequence" before "categorically exclud[ing it] from a cognizable claim of ineffective assistance of counsel and a defendant's sixth amendment rights." *Id*. at 455. In concluding that involuntary commitment was a sufficiently severe consequence, the court highlighted scholarship arguing for a broader reading of counsel's role in advising on consequences of a guilty plea than that ordinarily assigned to the district court under either Rule 11 or the Fifth Amendment. *Id*. at 453–54 (endorsing the observation of several commentators that "counsel's role encompasses a broader range of considerations" than the court's role in advising about collateral consequences in the plea process); *see, e.g.*, Chin & Holmes, *supra* note 4, at 730 ("There is good reason to doubt that the duties and conduct of courts and defense lawyers should be regarded as identical in this [duty of advisement] context."); Margaret Colgate Love, *Collateral Consequences After* Padilla v. Kentucky*: From Punishment to Regulation,* 31 ST. LOUIS U. PUB. L. REV. 87, 100 (2011) ("The considerations that make the direct/collateral distinction sensible from the standpoint of institutional competence when applied to a court, do not apply to criminal defense lawyers' relationships with their clients."); Roberts, *supra* note 3, at 696–97 (explaining that "importation

The Majority implicitly acknowledges this limitation on *Youngs*'s holding, *see* Maj. Op. at 15 n.47, but still asserts generally that, in its view, the Fifth Amendment due process obligation of the court and Sixth Amendment effective assistance of counsel contexts are "closely analogous," *id.* at 6 n.6, and "closely related," *id.* at 15. And doubtless there is important overlap between the court's Fifth Amendment obligations and counsel's Sixth Amendment obligations; the analysis of one might inform the other. It strikes me as incorrect, however, as it did the *Youngs* court, to act on an apparent assumption that in truth an identical standard governs both constitutional protections. *Cf. Michel v. United States*, 507 F.2d 461, 466 (2d Cir. 1974) ("Defense counsel is in a much better position to ascertain the personal circumstances of his client so as to determine what indirect consequences the guilty plea may trigger."). Thus, in light of the different governing standards, we held in *Youngs* that "the *Padilla* Court's unwillingness to apply the direct/collateral distinction in the Sixth Amendment context does not demonstrate the Court's intention to do away with that distinction entirely in the Fifth Amendment context." *Youngs*, 687 F.3d at 62; *see also United States v. Delgado-Ramos*, 635 F.3d 1237, 1241 (9th Cir. 2011) ("While *Padilla*'s holding is directly applicable to our Sixth Amendment analysis . . . , it sheds no light on the obligations a district court may have under Rule 11 and due process."). Accordingly, I cannot agree with the Majority's contention that *Youngs* directs us to apply the direct/collateral distinction in the Sixth Amendment context, or to do so in all cases except those on all fours with *Padilla*.

\* \* \*

While I worry that the Majority's broad language risks foreclosing future Sixth Amendment challenges based on failures to advise as to other assertedly "collateral"

---

of the due process-based collateral-consequences rule into the ineffective assistance realm is highly problematic because it treats the roles of defense counsel and the trial judge as identical" even though "[t]he judge and defense counsel play very different roles with respect to a person pleading guilty in a criminal case").

consequences,[10] in my view the Majority's primary error lies in its reluctance to apply *Padilla*'s reasoning step-by-step, methodically, to the specific risk of denaturalization, deferring instead to a broad-brush application of a traditional direct/collateral distinction. As detailed above, the Majority has not identified any authority—from our Court or otherwise—that compels continued application of the distinction in all cases not leading directly to immediate and automatic deportation. Contrary to the Majority's contention, cases since *Padilla*—including those the Majority relies on—do, indeed, reflect "a widespread reconsideration of the previously settled law." *See* Maj. Op. at 11. In light of *Padilla*, we should carefully evaluate whether the direct/collateral distinction properly applies to denaturalization in the context of Sixth Amendment claims of ineffective assistance. In doing so, we should also consider how developments in the criminal justice system—including the well-known, widespread, and dominant use of plea bargaining[11] and the growing prevalence and severity of consequences of a

---

[10] These other "collateral" consequences, too, can be harsh—and more severe than the "direct" punishment imposed for a conviction. *See* Chin & Holmes, *supra* note 4, at 699–700 (describing how "the imposition of collateral consequences has become an increasingly central purpose of the modern criminal process," in many cases "[t]he real work of the conviction is performed by the collateral consequences," and "traditional sanctions such as fine[s] or imprisonment are comparatively insignificant").

[11] As of 2009—shortly after Farhane pleaded guilty—guilty pleas represented ninety-seven percent of federal convictions and ninety-four percent of state convictions. *See Missouri v. Frye*, 566 U.S. 134, 143 (2012). In contrast, until the 1970s, "15% to 20% of federal defendants went to trial. But as soon as mandatory minimums and mandatory guidelines took effect in the late 1970s and early 1980s, the percentage began to rapidly decrease: by 2000 only 5% of all federal defendants (reportedly even a smaller percentage of state defendants) went to trial. In 2015, only 2.9% of federal defendants went to trial . . . ." Jed S. Rakoff, *Why Prosecutors Rule the Criminal Justice System—and What Can Be Done About It*, 111 Nᴡ. U. L. Rᴇᴠ. 1429, 1432 (2017). The Supreme Court thus recognized, "[t]he reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages." *Frye*, 566 U.S. at 143.

conviction,[12] including denaturalization—bear on counsel's constitutional responsibilities to advise or seek advice on such consequences and to discuss them with his client before the client enters a guilty plea.

B.  Under *Padilla*, the direct/collateral dichotomy is ill suited to denaturalization.

This Court should follow the courts that have responded to *Padilla* by reexamining the automatic application of the direct/collateral dichotomy to resolve Sixth Amendment ineffective assistance claims. At the very least, we should now consider carefully whether denaturalization is sufficiently severe and "intimately related to the criminal process" such that *Padilla*'s reasoning precludes the summary conclusion that denaturalization is a merely "collateral" consequence of Farhane's guilty plea as to which no pre-plea advice was due. *See* 559 U.S. at 365.

As emphasized above, in *Padilla*, the Court held that "[t]he collateral versus direct distinction is . . . ill suited to evaluating a *Strickland* claim concerning the specific *risk of deportation*." 559 U.S. at 366 (emphasis added). The Court's holding rested on deportation's "particularly severe" nature, and developments in immigration law that had made removal "nearly an automatic result" of guilty pleas to certain offenses "for a

---

[12] *See, e.g.*, Lynn Adelman, *Criminal Justice Reform: The Present Moment*, 2015 WIS. L. REV. 181, 183 (2015) (describing how, in the 1960s, "[c]ollateral consequences were less numerous, less severe, and not as difficult to avoid or mitigate"); Roberts, *supra* note 3, at 700 (noting that "[t]he *Brady* decision [in 1970] came well before the current reality of widespread, harsh collateral consequences," and arguing that "[t]he collateral-consequences rule is outdated for three interrelated reasons: (1) the rise in the percentage of criminal prosecutions that are resolved by guilty plea; (2) increased prosecution of minor offenses; and (3) the rise in the number and severity of collateral consequences of criminal convictions"); *ABA Standards for Criminal Justice: Pleas of Guilty*, Commentary to Standard 14-3.2(f), at 126 (3d ed. 1999) ("An increasing burden must fall to defense counsel by virtue of the growing number and range of consequences of conviction.").

broad class of noncitizen offenders," highlighting how "enmeshed criminal convictions and the penalty of deportation" had become. *Id.* at 365–66.

Considering the same factors, it is apparent that the direct/collateral dichotomy is likewise a poor fit for evaluating a Sixth Amendment claim concerning the risk of denaturalization: that is, complete loss of U.S. citizenship. First, both the government and the Majority agree with Farhane that denaturalization is a severe penalty, with effects comparable to those arising from deportation. Maj. Op. at 12–13.[13] The Supreme Court "has long recognized the plain fact that to deprive a person of his American citizenship is an extraordinarily severe penalty." *Klapprott*, 335 U.S. at 612. And, for naturalized citizens like Farhane, denaturalization typically presages deportation with the separation from family and other deep losses that entails.

Second, for naturalized citizens who plead guilty to criminal conduct predating their naturalization, that plea carries with it an automatic and heightened risk of denaturalization. Denaturalization, like deportation, is thus "enmeshed" in the criminal justice system. *See Padilla*, 559 U.S. at 365–66. The civil denaturalization statute directs revocation of citizenship on the ground that the naturalization was "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a).[14] A naturalized citizen has illegally procured citizenship and concealed

---

[13] Denaturalization revokes citizenship conferred by a court and returns the individual to the immigration status held pre-naturalization effective as of the original naturalization date. U.S. Citizenship & Immigration Servs., 12 Policy Manual, Part L—Revocation of Naturalization, Ch. 3—Effects of Revocation of Naturalization, *available at* https://www.uscis.gov/policy-manual/volume-12-part-l-chapter-3 (current as of July 31, 2023). It entails loss of the right to vote and a new, extreme vulnerability to deportation. As noted further below, *infra* note 17, it can also mean the loss of citizenship for children who derive citizenship from the denaturalized parent. Indeed, in Farhane's case, those two of his children whose citizenship is derived from his naturalization will "be deemed to have lost and to lose [their] citizenship" as of Farhane's denaturalization. 8 U.S.C. § 1451(d).

[14] Further highlighting denaturalization's relationship to the criminal justice system, Farhane's plea made him vulnerable to a charge of naturalization fraud under 18 U.S.C. § 1425.

20

a material fact when he does not disclose illegal conduct occurring before his citizenship application but naturalizes despite that nondisclosure.[15] *See Kungys v. United States*, 485 U.S. 759, 767 (1988). And, as described above, a defendant in a denaturalization proceeding may not contest the factual underpinnings of the government's case if it is based on conduct to which the defendant has already pleaded guilty. *See Maietta*, 84 F.3d at 102 n.1. Then, because courts "lack equitable discretion to refrain from entering

---

Upon a conviction under that statute, 8 U.S.C. § 1451 provides that the court of conviction "*shall thereupon revoke*, set aside, and declare void the final order admitting such person to citizenship, and *shall declare* the certificate of naturalization of such person to be canceled." *See* 8 U.S.C. § 1451(a), (e) (emphasis added).

Notwithstanding this automatic relationship between criminal penalty and criminal denaturalization, at least some government entities have recommended civil denaturalization under section 1451(a) as "the most effective remedy" for the government after a naturalized citizen's criminal conviction because of "the broader scope of actions warranting [civil] denaturalization," and the "constitutional and statutory limitations inherent in [criminal] actions." Anthony D. Bianco et al., *Civil Denaturalization: Safeguarding the Integrity of U.S. Citizenship*, 65 U.S. Attys' Bull. 5, 8 (July 2017). In civil denaturalization proceedings, for example, the government need only show "clear, unequivocal, and convincing" proof of the alleged conduct—a lighter burden than "establish[ing] the offense and its elements beyond a reasonable doubt," as required in a criminal prosecution. *Id.* The government may also prefer civil proceedings because "many of the due process protections afforded in a criminal proceeding, such as a jury trial and a right to counsel, are not mandated," and because no statute of limitations applies. *Id.* The overarching point is that a guilty plea like Farhane's triggers serious exposure to denaturalization under at least two different approaches available to the government.

[15] Accordingly, the standard citizenship application form asks all applicants, "Have you **EVER** committed . . . a crime or offense for which you were **NOT** arrested?" *Maslenjak v. United States*, 582 U.S. 335, 346 (2017) (bold in original). An admission to having engaged in many types of criminal conduct automatically precludes an applicant from demonstrating the "good moral character" required for naturalization. *See* 8 C.F.R. § 316.10(b)(2)(iv), (b)(3)(iii). Thus, a naturalized citizen who pleads guilty to any such pre-naturalization conduct will necessarily have illegally procured his citizenship and failed to disclose that conduct when applying for citizenship. *See* 8 U.S.C. §§ 1427(a), 1451(a). That guilty plea therefore makes the citizen vulnerable to the denaturalization statute, which provides, "It *shall* be the duty of" the government "to institute proceedings . . . for the purpose of revoking and setting aside" naturalization in such circumstances. *See id.* § 1451(a).

a judgment of denaturalization against a naturalized citizen whose citizenship was procured illegally or by willful misrepresentation of material facts," *Fedorenko*, 449 U.S. at 517, a serious risk of denaturalization is virtually automatic once the citizen has pleaded guilty to pre-naturalization illegal conduct.

Such severe and nearly automatic consequences of a guilty plea are exemplified by Farhane's circumstances. Through his guilty plea, Farhane admitted that beginning in November 2001, he conspired to commit money laundering in violation of 18 U.S.C. § 371.[16] Accordingly, in a denaturalization proceeding, he will have effectively admitted that he illegally procured his citizenship based on his criminal conduct occurring shortly before his 2002 naturalization, and that he concealed a material fact or made a willful misrepresentation regarding that criminal conduct. *See* 8 U.S.C. § 1451(a). And, as already noted, the court adjudicating the government's denaturalization petition will have "no discretion to excuse the conduct." *Fedorenko*, 449 U.S. at 517. Farhane will therefore almost inevitably lose his U.S. citizenship, and two of his children will then lose theirs.[17] *See* 8 U.S.C. § 1451(d).

---

[16] So far as the parties have advised and our examination has revealed, the record contains no evidence that the conspiracy Farhane pleaded guilty to—while serious and deserving of the carceral sentence he received—resulted in the actual transfer of any funds. At sentencing, Farhane's counsel stated, "eventually this whole thing petered out. Nothing, the government concedes, was transferred, no money or equipment was transferred to anyone. Then the government kept tabs on Mr. Farhane for four years. They sent other people to investigate him, other [confidential informants,] . . . to see if he would be willing to engage in conduct, and nothing happened . . . ." J. App'x at 283. And, although he was sentenced to thirteen years' imprisonment, Farhane was released three years early in light of his record of good behavior.

[17] The governing statute provides that where an individual is denaturalized based on concealment of a material fact or willful misrepresentation in procuring naturalization—as would be the case with Farhane—any person claiming citizenship through such denaturalized person "shall be deemed to have lost . . . citizenship." 8 U.S.C. 1451(d); *see also* Bianco et al., *supra* note 14, at 16 ("If the defendant's spouse or children obtained citizenship based on the defendant's naturalization, the denaturalization judgment revokes the spouse's and children's naturalization as a matter of law.").

The Majority's stated reasons for finding that Farhane received effective assistance of counsel despite the absence of a warning as to these highly probable results are not persuasive. The Majority does not dispute that denaturalization is a likely and severe consequence of Farhane's guilty plea, nor that Farhane's deportation is highly probable after his denaturalization. Instead, the Majority states that denaturalization lacks the "automatic" relationship to the guilty plea that the *Padilla* Court attributed to deportation, and that this attenuation relieves counsel of the obligation to call the risk of the consequence to a defendant's attention. Maj. Op. at 14.

But the Majority's argument that denaturalization is not sufficiently automatic is not convincing. The Majority observes that "[c]ivil denaturalization is a separate proceeding that may or may not occur following the plea." Maj. Op. at 15. But the same is true, of course, of deportation proceedings that follow entry of a guilty plea. *Padilla*, 559 U.S. at 365 (acknowledging that removal is "civil in nature" and "not, in a strict sense, a criminal sanction"). Similarly, the Majority points out that denaturalization can occur without a criminal conviction. Again, the same is true of deportation. *See, e.g.*, 8 U.S.C § 1227(a)(1), (3)–(6) (providing numerous grounds for removal not predicated on a criminal conviction).[18] In focusing on these mistaken distinctions, the Majority overlooks a fundamental similarity: many convictions create a "nearly . . . automatic" risk of denaturalization, just as they do for deportation, because the applicable statutory and regulatory provisions establish that an applicant is ineligible for naturalization based on the criminal conduct admitted to in a guilty plea. *See Padilla*, 559 U.S. at 366.[19]

---

[18] As earlier noted, *supra* note 14, denaturalization is closely connected to the criminal process also because the government may pursue criminal denaturalization charges against defendants who unlawfully procure their naturalizations. *See* 18 U.S.C. § 1425.

[19] As discussed above, specific types of criminal conduct render an individual ineligible for naturalization. *See supra* at 21 & n.15. The fact that one must consult other statutory provisions to determine whether prior criminal conduct renders naturalization "illegally procured," 8 U.S.C. § 1451(a), does not make the operation of these provisions any less automatic following a

The Majority also asserts that "[t]he government exercises considerable discretion in bringing denaturalization cases," implying that the absence of certainty, too, excuses counsel's failure to advise of the risk. Maj. Op. at 15. But the Supreme Court decided *Padilla* as it did while recognizing "the equitable discretion vested in the Attorney General to cancel removal . . . ." *See* 559 U.S. at 364. Moreover, pathways to avoid removal remain even for noncitizens convicted of offenses like Padilla's, including through prosecutorial restraint. *See, e.g., Ortiz v. Lynch*, 640 F. App'x 42, 44–45 (2d Cir. 2016) (summary order) (referencing memorandum from Department of Homeland Security directing prosecutorial discretion in pursuing removals, including of certain noncitizens convicted of aggravated felonies); *State v. Shata*, 868 N.W.2d 93, 108–10 (Wis. 2015) (recognizing the executive branch's "essentially unreviewable prosecutorial discretion with respect to commencing deportation proceedings"). It is for those reasons, perhaps, that the Court in *Padilla* did not speak in absolute terms: it found that constitutionally effective counsel had an obligation to warn that a "*risk* of deportation" flowed "*nearly*" automatically from a guilty plea. 559 U.S. at 366 (emphasis added). The defendant there was only "*subject to* automatic deportation," *id.* at 360

---

guilty plea to such conduct. Further, there may be room for argument—and litigation—regarding whether a *particular* criminal conviction provides a basis for denaturalization. But the same is true, of course, for deportation. We need only look to a sampling of the cases this court has adjudicated involving complex applications of the "categorical approach" to recognize that whether a particular conviction renders a person deportable is often not cut-and-dried. *See, e.g., Debique v. Garland*, 58 F.4th 676, 680–85 (2d Cir. 2023) (applying categorical approach to determine whether sexual abuse of a minor was an "aggravated felony" and "a crime of child abuse" that made petitioner removable); *Jack v. Barr*, 966 F.3d 95, 97–99 (2d Cir. 2020) (assessing whether New York convictions for possession and sale of firearms rendered petitioner removable); *Hylton v. Sessions*, 897 F.3d 57, 60–63 (2d Cir. 2018) (same for state conviction for sale of marijuana). The potential for debate about whether a particular conviction actually renders a noncitizen deportable does not affect whether, under *Padilla*, counsel is required to advise that a guilty plea carries a "risk of deportation." 559 U.S. at 374. The same is true with respect to whether a particular guilty plea carries with it a risk of denaturalization.

(emphasis added); in other words, he would be deportable, but it did not necessarily follow that he would automatically be deported. In the same way, a defendant whose guilty plea exposes him to denaturalization is subject to denaturalization; that does not necessarily mean that he will automatically be denaturalized.

Finally, the Majority asserts that the district court has "considerable discretion . . . in evaluating the evidence" in a denaturalization proceeding. Maj. Op. at 15–16. As already emphasized, however, courts *lack* discretion to reevaluate evidence established by an earlier guilty plea, *Maietta*, 84 F.3d at 102 n.1, and they lack any equitable discretion to deny the government's application to revoke the citizenship of a citizen subject to denaturalization, *Fedorenko*, 449 U.S. at 517. Similarly, courts are generally understood to lack equitable discretion to deny a government application to remove a noncitizen who is subject to deportation. *See Padilla*, 559 U.S. at 362–64. As *Padilla* recognized, it is this lack of judicial discretion that creates a nearly automatic risk of deportation—and the same is true for denaturalization proceedings based on a prior criminal conduct.

In sum, the Majority's reasoning does not justify its view that denaturalization lacks the "'automatic' relationship to the guilty plea" that the *Padilla* Court saw in deportation. Maj. Op. at 14; *see* 559 U.S. at 366. Considering both denaturalization's severity and its similarly automatic nature in cases such as Farhane's, it is my view that the "collateral versus direct distinction" is "ill suited to evaluating a *Strickland* claim concerning the specific risk of" denaturalization. *Padilla*, 559 U.S. at 366.

C.  The direct/collateral dichotomy does not apply for the additional reason that Farhane's plea exposes him to a substantial risk of deportation.

The Majority's conclusion that the direct/collateral framework applies and bars consideration of Farhane's Sixth Amendment claim is also wrong for a separate, albeit

related, reason: Farhane faces a substantial "risk of deportation" based on his guilty plea. *Id.*

As detailed above, Farhane's guilty plea exposes him to a tremendous risk of denaturalization: The government has already initiated denaturalization proceedings against him, using the admissions in his guilty plea as the foundation of its complaint. But once his citizenship is revoked, Farhane will be subject to removal as a noncitizen convicted of an aggravated felony. *See* 8 U.S.C. §§ 1101(a)(43)(D), (U), 1227(a)(2)(A)(iii); *Dimaya*, 138 S. Ct. at 1211 ("[R]emoval is a virtual certainty for an alien found to have an aggravated felony conviction, no matter how long he has previously resided here."). The record leaves no room for doubt that the government intends to pursue such removal proceedings. As a 2017 Department of Justice bulletin explained, "Typically, the government does not expend resources on civil denaturalization actions unless the ultimate goal is the removal of the defendant from the United States. [DOJ] attorneys confirm that goal before filing the complaint." Anthony D. Bianco et al., *Civil Denaturalization: Safeguarding the Integrity of U.S. Citizenship*, 65 U.S. Attys' Bull. 5, 17 (July 2017).[20] While the government may offer—as it did to Farhane—to "negotiate terms of a settlement of a denaturalization case," those terms "will not include any promise of relief from removal." *Id.* Therefore, although Farhane must be denaturalized before he can be deported, he nonetheless plainly faces a substantial "risk of deportation" based on his guilty plea. *Padilla*, 559 U.S. at 366. His counsel failed to advise him of that risk in addition to the risk of denaturalization. Accordingly, under *Padilla*, Farhane's claim is not subject to the direct/collateral dichotomy and cannot be

---

[20] I note in passing that Anthony D. Bianco is the lead author of the quoted article in the DOJ bulletin, which advises of likely deportation after denaturalization. Mr. Bianco has appeared as government counsel on the pending denaturalization complaint against Farhane.

barred as a merely collateral consequence of his plea; rather, it is governed by *Strickland*. *Id.*

The Majority counters that "[b]ecause denaturalization is collateral, everything thereafter . . . is also collateral." Maj. Op. at 17. The Majority's assertion cannot be squared with *Padilla*'s holding, which—the Court there emphasized time and again—applies to the need for advice regarding a client's "risk of deportation." *Padilla*, 559 U.S. at 366–67, 374; *accord Chaidez*, 568 U.S. at 344 ("In [*Padilla*], this Court held that the Sixth Amendment requires an attorney for a criminal defendant to provide advice about the risk of deportation arising from a guilty plea."). I do not mean to suggest that effective counsel must warn of *every* consequence that could eventually lead to deportation, no matter how attenuated the connection between that consequence and deportation. But as described above, the connection between denaturalization and deportation is obvious and explicit. The Majority's argument might be more persuasive if *Padilla* applied only to cases in which a defendant faces a certainty of immediate deportation, but that was not *Padilla*'s holding. Nor did *Padilla* limit its application to claims brought by noncitizen defendants; it described its conclusion as applying broadly to any "client"—without differentiation—whose plea carries a "risk of deportation." 559 U.S. at 374 ("[W]e now hold that counsel must inform her client whether his plea carries a risk of deportation.").

Indeed, it seems paradoxical to construe *Padilla* to provide stronger protection to a *noncitizen* at risk of deportation (like Padilla) than to a *U.S. citizen* at risk of denaturalization followed by deportation (like Farhane). Had Farhane been a lawful permanent resident when he pleaded guilty, rather than a naturalized citizen, it would be settled by *Padilla* that *Strickland* governed his Sixth Amendment ineffective assistance claim. It is difficult to fault the argument put forward by Farhane and *amici* that it makes little sense for the Sixth Amendment to "provide more protection to a noncitizen who was given misadvice, or no advice at all, about the deportation consequences of a

27

guilty plea, than to a naturalized citizen who was similarly not warned about the possible loss of citizenship, to be followed by deportation." Appellant's Reply Br. at 12; *see* Br. of *Amicus Curiae* Immigrant Defense Project at 22 ("[T]he logic of *Padilla* must apply equally, if not more forcefully, to defendants who face the risk of losing their *citizenship* and being removed from this country."); Br. of *Amici Curiae* National Association of Criminal Defense Lawyers et al. at 13 ("It hardly makes sense to say that counsel has a Sixth Amendment duty to inform her client whether his plea carries a risk of deportation, *except* when the government first has to strip the client of citizenship." (internal quotation marks omitted)).

The Majority dismisses this argument as "compar[ing] apples to oranges," Maj. Op. at 18. They point out, correctly, that Congress created different statutory schemes for denaturalization and deportation. But no *statute* compels the result that the Majority reaches. The Sixth Amendment interpretation and the direct/collateral framework that the Majority invokes represent judge-made doctrines. Particularly in light of the Supreme Court's directive to consider the merits of a Sixth Amendment claim when a guilty plea carries a "risk of deportation," *Padilla*, 559 U.S. at 366, 374, we should take a more flexible, less rote approach.

* * *

For the foregoing reasons, I would decline to apply the direct/collateral distinction here and would not dismiss Farhane's claim as concerning a merely collateral consequence of his plea. Instead, I would proceed to address the merits of his claim that he received ineffective assistance of counsel under the Sixth Amendment.

## II. Farhane received objectively unreasonable representation.

Turning, then, to the merits, I conclude that Farhane received objectively unreasonable assistance from his trial counsel. The failure to advise him as to the risks

28

of denaturalization and deportation were objectively unreasonable in 2006, when he was counseled to plead guilty, and it would be objectively unreasonably now, in 2023.

To establish a claim for ineffective assistance of counsel, a defendant must show (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) that "any deficiencies in counsel's performance [were] prejudicial to the defense." *Strickland*, 466 U.S. at 688, 692. A defendant satisfies the first prong by showing that his counsel's performance "falls outside the 'wide range of professionally competent assistance.'" *Kovacs v. United States*, 744 F.3d 44, 50 (2d Cir. 2014) (quoting *Strickland*, 466 U.S. at 690). To determine objective reasonableness, the Supreme Court instructs us to evaluate "prevailing professional norms" at the time of the representation, using "American Bar Association ["ABA"] standards and the like [as] guides to determining what is reasonable." *Padilla*, 559 U.S. at 366 (internal quotation marks omitted).

    A. <u>Prevailing professional norms in 2006 required attorneys to advise clients about the risk of denaturalization and deportation.</u>

Farhane argues that the performance of his trial counsel (an individual not representing him in this appeal) was objectively unreasonable because counsel failed to advise him of the likely denaturalization and deportation resulting from his guilty plea. I agree. *Padilla* may have "mark[ed] a major upheaval in Sixth Amendment law" by applying *Strickland* to the particular ineffective assistance claim at issue there, *id.* at 383 (Alito, J., concurring). But under prevailing professional norms in 2006—just as in 2002, when Padilla received advice on his plea, *id.* at 367–68—counsel's failure to advise Farhane about the immigration consequences of his guilty plea, or indeed even to flag any possible adverse immigration consequences, was objectively unreasonable, in two ways.

First, as reviewed above, Farhane's guilty plea exposes him to a substantial risk of deportation. As the Court detailed in *Padilla*, "[t]he weight of prevailing professional norms supports the view that counsel must advise her client"—naturalized citizen or noncitizen—"regarding the risk of deportation." *Id.* at 367. The Court emphasized that "[f]or at least the past 15 years"—that is, *since at least 1995*—"professional norms have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client's plea."[21] *Id.* at 372. The Court therefore held that "counsel must inform her client whether his plea carries a risk of deportation," and that failure to do so constitutes objectively unreasonable assistance. *Id.* at 374. Although for Farhane, denaturalization is a predicate step to deportation, the two are tightly linked, as demonstrated above: when a naturalized citizen faces a risk of denaturalization, he will almost always face an accompanying risk of deportation. Indeed, because of his guilty plea, Farhane is now exposed to a substantial risk of deportation. Accepting Farhane's allegations as true, his trial counsel did not warn him of this potential consequence. Accordingly, by the time Farhane pleaded guilty in 2006, counsel's performance fell outside the "wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. As already observed, to hold otherwise creates the nonsensical result that the Sixth Amendment provides less protection to naturalized citizens at risk of deportation than to noncitizens facing the same potential consequence.

---

[21] In *Chaidez*, the Supreme Court held that the rule announced in *Padilla* does not apply retroactively to claims brought by defendants whose convictions became final before *Padilla* was decided. *Chaidez*, 568 U.S. at 347. There is no dispute that Farhane may rely on *Padilla* in his habeas petition, however, because his conviction did not become final until May 2011, after *Padilla* was decided. Additionally, although the Supreme Court decided *Padilla* in 2010, the defendant in the underlying criminal case, Jose Padilla, was counseled and entered his guilty plea in 2002—*four years before Farhane pleaded guilty. See Padilla v. Commonwealth*, 381 S.W.3d at 324. The Court's analysis of the prevailing professional norms with respect to immigration consequences therefore applies with as much force in the context of Farhane's representation as Padilla's.

Second, and more broadly, professional norms prevailing in 2006 when Farhane pleaded guilty required defense counsel to advise clients about any substantial immigration consequences that follow guilty pleas, including denaturalization. When Farhane entered his guilty plea, the ABA Standards for Criminal Justice provided—in the commentary to the same section and version referenced by the Supreme Court in *Padilla*, 559 U.S. at 367:

> [C]ounsel should interview the client to determine what collateral consequences are likely to be important to a client given the client's particular personal circumstances and the charges the client faces. . . . [I]t may well be that many clients' greatest potential difficulty, and greatest priority, will be the immigration consequences of a conviction. To reflect this reality, counsel should be familiar with the basic immigration consequences that flow from different types of guilty pleas, and should keep this in mind in investigating law and fact and advising the client.

*ABA Standards for Criminal Justice: Pleas of Guilty*, Commentary to Standard 14-3.2(f), at 127 (3d ed. 1999).

Likewise, as of 2005, the New York State Bar Association stated that defense counsel should "[o]btain[] all available information concerning the client's background and circumstances for purposes of . . . avoiding, if at all possible, collateral consequences including but not limited to deportation" and should also "[p]rovid[e] the client with full information concerning such matters as . . . immigration . . . and other collateral consequences under all possible eventualities." *NYSBA Standards for Providing Mandated Representation*, Standard I-7(a), (e), at 16–17 (2005).

Another resource cited by the Supreme Court in *Padilla*, 559 U.S. at 367, similarly explained that, even as of 1997, "defense counsel should advise the defendant of . . . [a]ll of the consequences and ramifications of a particular plea, including . . . effects on . . . immigration status." G. Nicholas Herman, *Plea Bargaining* § 3:03, at 20–21 (1997). And a 2005 publication by the New York State Defenders Association's Immigrant Defense Project warned defense counsel to be cognizant that "the government can attempt to

31

take away the citizenship of a naturalized citizen" who then "may again be vulnerable to deportation" based on a criminal conviction. New York State Defenders Ass'n Immigrant Defense Project et al., *Deportation 101*, at 21 (Feb. 2005); *see also* Br. of *Amicus Curiae* Immigrant Defense Project at 13 ("At the time of Mr. Farhane's case, long-established professional norms required defense counsel to advise a client regarding the immigration consequences of a plea.").

The government does not meaningfully dispute that, by 2006, professional norms required defense counsel to provide advice on immigration consequences of guilty pleas. Instead, the government argues that because several of the resources cited above refer to "immigration consequences generally," without "specifically discuss[ing] denaturalization," those resources do not support the contention that a defense attorney attuned to such "general" consequences would be "aware of the possibility of civil denaturalization, which, unlike every other immigration consequence, affects United States citizens." Appellee's Br. at 32–33.

The government's argument is unpersuasive. Denaturalization is undoubtedly a severe immigration consequence, as the government itself recognizes; it is also an important element of the government's program of enforcing immigration laws generally. *See* Bianco et al., 65 U.S. Attys' Bull. at 5 (quoting Attorney General Jefferson B. Sessions III's statement that DOJ "will aggressively pursue denaturalization . . . to strategically enforce the nation's immigration laws" (omission in original)); *id.* at 6 ("Actions to revoke naturalization unlawfully obtained or obtained by fraud are an integral part of the government's arsenal of remedies to enforce the immigration laws . . . ."). It affects only people who immigrated to the United States, and it is intended to lead to removal from the country, making it at least as severe as deportation. *See Klapprott*, 335 U.S. at 616–17 (Rutledge, J., concurring) (commenting that "[t]o take away a man's citizenship deprives him of a right no less precious than life or liberty" and that "in its wake may follow the most cruel penalty of banishment").

Further, the denaturalization laws are neither obscure nor difficult to understand. By the time Farhane faced criminal charges, the statute authorizing denaturalization had not been materially amended in more than forty years. *Compare* 8 U.S.C. § 1451(a) (as most recently amended in 1994) *with* Immigration and Nationality Act, Pub. L. No. 414, § 340, 66 Stat. 163, 260 (1952) *and* Act of Sept. 26, 1961, Pub. L. No. 87-301, § 18, 75 Stat. 650, 656. With respect to the grounds for denaturalization, the statute is "succinct, clear, and explicit."[22] *Padilla*, 559 U.S. at 368. And the statute was at issue in numerous published decisions involving civil denaturalization, *see, e.g.*, *Kungys*, 485 U.S. at 763–64, including decisions of our Court in the period shortly before Farhane pleaded guilty, *see, e.g.*, *United States v. Reimer*, 356 F.3d 456, 457 (2d Cir. 2004). Indeed, the government's briefing implicitly recognizes as much. *See* Appellee's Br. at 14 (citing statutory provisions and caselaw preceding Farhane's plea related to civil denaturalization actions).

---

[22] Section 1451(a) provides in relevant part:

> *It shall be the duty* of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any district court of the United States in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization *were illegally procured or were procured by concealment of a material fact or by willful misrepresentation*, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively.

8 U.S.C. § 1451(a) (emphasis added). Even minimal research into the grounds for denaturalization identified in the statute and Farhane's circumstances would reveal the several potential bases for deportation that Farhane would be exposed to based on his guilty plea, as discussed elsewhere. *See supra* note 15.

As these authorities demonstrate, the potential consequences of a guilty plea for a naturalized American's citizenship status and ability to remain in the country were well known when counsel advised Farhane to plead guilty to criminal conduct occurring before his naturalization. That some contemporaneous practice guides do not specifically mention denaturalization does not absolve counsel of the general responsibility to, at the very least, advise the client "that pending criminal charges may carry a risk of adverse immigration consequences." *Padilla*, 559 U.S. at 369. This duty exists even if defense counsel, who need not be "well versed" in immigration law, sees the potential consequences as "unclear or uncertain." *Id.* Accordingly, I find unpersuasive the government's contention that the professional norms prevailing in 2007 and requiring defense counsel to advise clients of potential adverse immigration consequences did not apply to the consequence of denaturalization.

This broader interpretation of defense counsel's duty is consistent with how the Supreme Court and our Court, both, have characterized *Padilla*'s holding. *See, e.g.*, *Chaidez*, 568 U.S. at 353 ("*Padilla* . . . made the *Strickland* test operative . . . when a criminal lawyer gives (or fails to give) advice about immigration consequences."); *Doe v. United States*, 915 F.3d 905, 910 (2d Cir. 2019) (characterizing *Padilla* as holding "that attorneys must affirmatively warn their clients of the immigration consequences of their potential convictions"); *Sutherland v. Holder*, 769 F.3d 144, 147 (2d Cir. 2014) (per curiam) ("*Padilla* . . . held that an attorney is ineffective for failing to advise a client of the immigration consequences of a guilty plea."). My interpretation also accords with other decisions suggesting that denaturalization is among the potential "immigration consequences" of which defendants should be made aware before entering a guilty plea. *See Rodriguez v. United States*, 730 F. App'x 39, 42 (2d Cir. 2018) (summary order) (finding that "counsel's apparent advice . . . that [a client] did not have to worry about the immigration consequences of a plea ignored the possibility of denaturalization" and

therefore fell below an objective standard of reasonableness);[23] *cf. United States v. Ataya*, 884 F.3d 318, 326 (6th Cir. 2018) (vacating a guilty plea, on plain error review, in part because "[a] plea colloquy that does not put the defendant on notice that pleading guilty will expose him to the loss of his American citizenship harms the fundamental purpose of the judicial proceeding").

In short, by the time Farhane entered his guilty plea in 2006, and as recognized by the *Padilla* Court as to advice given in 2002, well-established prevailing professional norms guided that defense counsel should advise a client that a plea agreement could carry substantial immigration consequences generally—consequences not limited to deportation. These norms weigh strongly in favor of the conclusion that Farhane received objectively unreasonable representation.[24]

---

[23] The government and the district court attempt to distinguish *Rodriguez* on the ground that *Rodriguez* involved affirmative misadvice from an attorney. That distinction is unavailing, however, for the reasons explained by the Supreme Court in rejecting the same argument in *Padilla*:

> A holding limited to affirmative misadvice would invite two absurd results. First, it would give counsel an incentive to remain silent on matters of great importance, even when answers are readily available. Silence under these circumstances would be fundamentally at odds with the critical obligation of counsel to advise the client of the advantages and disadvantages of a plea agreement. . . . Second, it would deny a class of clients least able to represent themselves the most rudimentary advice on deportation even when it is readily available.

559 U.S. at 370–71 (internal quotation marks omitted). These considerations weigh just as strongly with respect to advice regarding denaturalization, and the government does not offer a persuasive argument in favor of upholding a distinction between misadvice and failure to advise in the denaturalization context.

[24] Nor are these norm-setting materials properly disregarded as merely "aspirations of a bar group." *Contra* Conc. Op. at 1. The Supreme Court in *Padilla*, while acknowledging that such guides are not "inexorable commands," understood them as "valuable measures of the prevailing professional norms of effective representation" in 2002, *Padilla*, 559 U.S. at 367; I see no reason not to do the same here.

B.      Defense counsel should have known that Farhane's guilty plea put him at risk of denaturalization and deportation.

The government also advances the view that, as the district court held, "nothing in the record suggests his lawyer knew, or should have known, about the circumstances giving rise to Mr. Farhane's denaturalization exposure," suggesting a concomitant absence of a duty to advise. Appellee's Br. at 32 (quoting *United States v. Farhane*, No. 05-cr-673-4 (LAP), No. 18-cv-11973 (LAP), 2020 WL 1527768, at *2 (S.D.N.Y. Mar. 31, 2020)); *see also id.* at 29 ("As the District Court found, Farhane's counsel had no reason to believe that Farhane faced a denaturalization risk."). The government's argument does not hold up, however, on the facts and under the prevailing professional norms discussed above.

For the reasons I have discussed, prevailing norms in 2006 called for trial counsel to advise Farhane of the "basic immigration consequences" that could flow from his criminal charges. *ABA Standards for Criminal Justice: Pleas of Guilty*, Commentary to Standard 14-3.2(f), at 127. As the ABA explained in 1999, "counsel has a duty to conduct a sufficient investigation to understand the unique issues that confront each client"; counsel should "interview the client to determine" which "consequences are likely to be important . . . given the client's particular personal circumstances and the charges the client faces." *Id.* at 120, 127; see Br. of *Amicus Curiae* Immigrant Defense Project at 14–16 (collecting authorities suggesting that defense counsel has "an affirmative duty to investigate the immigration consequences of a criminal case for all clients who are not born in the United States").

Here, the record reflects that trial counsel had all the information necessary to prompt an inquiry into whether severe immigration consequences could result from Farhane's guilty plea. As of at least the initial detention hearing on November 2, 2005—about one year before Farhane entered his guilty plea—counsel's own statements reflected awareness that Farhane was an immigrant and a naturalized citizen. *See* J.

36

App'x at 128 (counsel stating that Farhane is "an immigrant. Yes. He's a naturalized United States citizen."). Judge Walker explains in his concurrence that, in his view, counsel did not act unreasonably in failing to advise Farhane about the risks of denaturalization (and likely deportation) because the record does not establish his knowledge as to "when Farhane was naturalized in relation to the crimes to which Farhane later pleaded guilty." Conc. Op. at 2. But if counsel was unaware of the timing, he could have easily learned this information by asking a single question of his client—a question he likely should have asked, given his knowledge of Farhane's status as a naturalized citizen. *See NYSBA Standards for Providing Mandated Representation*, Standard I-7(a), (e), at 16–17 (2005) (stating that defense counsel should inquire into the client's background to advise regarding potential collateral consequences, "including but not limited to deportation"). Upon inquiring into the timing of Farhane's naturalization, even superficial research into the statutes and caselaw regarding denaturalization would have revealed the denaturalization and deportation risks associated with entry of a guilty plea.[25]

Counsel had another reason, too, to be on notice of the potential denaturalization consequences of Farhane's guilty plea: one amicus represents, and the government does not appear to contest, that "[a]n above-average number of civil denaturalization cases were filed in 2001 and 2002 and were attributable to prosecution trends in the wake of the events of September 11." Br. of *Amicus Curiae* Immigrant Defense Project at 7–8.[26]

---

[25] There can be no doubt that, by the start of the sentencing phase, counsel should have known that the conduct underlying Farhane's guilty plea predated his naturalization: counsel's sentencing memorandum references the paragraph of the presentence investigation report including the statement that Farhane became a naturalized citizen on April 19, 2002, and further notes that part of Farhane's offense conduct dated to "late 2001." J. App'x at 206.

[26] *But see* Irina D. Manta & Cassandra B. Robertson, *Inalienable Citizenship*, 99 N.C. L. Rev. 1425, 1438 (2021) (asserting that "even the period after 9/11 did not involve a spike [in denaturalization proceedings] after leaders of both political parties opposed proposals to use denaturalization in the fight against terrorism"). The authors also note, however, in discussing

The potential risk of denaturalization was thus particularly acute for Farhane, who was indicted in the Southern District of New York on money-laundering charges arising out of a terrorism investigation begun in the wake of the September 11 attacks.

Judge Walker and the government also urge that, "[g]iven the infrequency with which the Government sought civil denaturalization, a criminal defense attorney who was unaware of such a risk in 2006 cannot be said to have acted unreasonably." Appellee's Br. at 34; *see also* Conc. Op. at 2 (describing denaturalization as "extremely rare" in 2006). But neither cites any authority to support the proposition that representation is not constitutionally deficient simply because a severe outcome occurs in a relatively small fraction of all proceedings.[27] To the contrary, counsel has an

---

Farhane's criminal case, that "in the months after 9/11, the government ramped up its law enforcement activities in Muslim communities to identify individuals who might be plotting terrorist attacks or assisting those interested in doing so." *Id.* at 1451.

[27] Although data show that the government pursued relatively few denaturalization actions between 1968 and 2012, "[o]ver the last decade, the federal government has mounted a new concerted campaign to increase the use of denaturalization to revoke the citizenship of foreign-born U.S. citizens . . . ." Amber Qureshi, *The Denaturalization Consequences of Guilty Pleas*, 130 YALE L.J.F. 166, 170, 173 (2020); *see also* Cassandra B. Robertson & Irina D. Manta, *(Un)civil Denaturalization*, 94 N.Y.U. L. REV. 402, 409–14 (2019) (remarking on the trend toward increased civil denaturalization proceedings for foreign-born U.S. citizens). In the first two years of President Trump's administration, the government "filed twice as many denaturalization cases in each of [those] years as the average number of denaturalization cases for the prior twelve years." Qureshi, *supra*, at 173; *see* Amanda Frost, *Alienating Citizens*, 114 NW. U. L. REV. 241, 245 (2019) (describing how the Obama administration's "investigation into a limited number of naturalization files, which it dubbed 'Operation Janus,'" was "escalated" by the Trump administration "into an investigation of hundreds of thousands of naturalized citizens for errors in the naturalization process"). An Amicus advises that, as denaturalization proceedings have become increasingly frequent, they have also begun to be "instituted against individuals who committed less serious crimes" than those giving rise to the typical denaturalization proceeding in the past. Br. for *Amicus Curiae* Asian Americans Advancing Justice at 23. These recent trends do not affect the analysis of whether trial counsel provided objectively reasonable representation to Farhane in 2006, true. They do underscore, however, the need for defense counsel *today* to advise clients of the risk of denaturalization. This need renders even more

obligation to understand and advise on the unique issues that confront each client. *See ABA Standards for Criminal Justice: Pleas of Guilty*, Commentary to Standard 14-3.2(f), at 120, 127. The authorities discussed above support the conclusion that, aware of Farhane's status as a naturalized citizen, trial counsel was obligated to conduct at least a minimal investigation of the relevant facts and to advise Farhane about the potential denaturalization consequences of his guilty plea.

For these reasons, the government is incorrect in asserting that counsel had no reason to know that the plea he advised Farhane to take would create a substantial risk of denaturalization and deportation.

C. <u>Farhane received objectively unreasonable assistance.</u>

In light of the foregoing, defense counsel was obligated at the very least to advise Farhane that the "pending criminal charges [against him] may carry a risk of adverse immigration consequences," including denaturalization and deportation. *Padilla*, 559 U.S. at 369. Farhane maintains—and the government does not contest—that his counsel did not provide any such warning or other advice related to immigration consequences, despite knowledge of Farhane's status as a naturalized citizen. Farhane plausibly avers that he would not have entered a guilty plea had he known that he could lose his U.S. citizenship or face deportation as a result, explaining that a plea agreement that "opened the door to loss of citizenship and deportation, and that exposed two of [his] children to a similar risk, was contrary to [his] priorities." J. App'x at 299. As the Supreme Court observed in *Padilla*, avoiding those permanent and drastic consequences "may be more important to the client than any potential jail sentence." 559 U.S. at 368 (internal quotation marks omitted).

---

concerning the broad effects that the Majority's categorical ruling—which appears to apply to *all* denaturalization risks, past, present, and future—may have.

Judge Walker adds that because *Padilla* was not decided until 2010—four years after Farhane's guilty plea—finding counsel's conduct objectively unreasonable is to "require[] an attorney to gaze into a crystal ball." Conc. Op. at 3. But this misstates Farhane's burden in this appeal; counsel need not have predicted *Padilla* nor its outcome to satisfy his Sixth Amendment obligations. The only relevant considerations are first, that "*Padilla* . . . is applicable law in this case," and second, that under such law, for the reasons above, counsel's conduct was objectively unreasonable when he counseled Farhane to enter his guilty plea without advising that the plea could result in loss of citizenship, and removal. *Id.*; *see also supra* note 21. Under these circumstances, counsel's failure to advise Farhane of the immigration consequences of his guilty plea was objectively unreasonable. The district court therefore erred when it concluded that Farhane failed to meet the first prong of the *Strickland* analysis.

To receive relief, however, Farhane must also satisfy *Strickland*'s second prong by demonstrating that he was prejudiced by counsel's performance. *See* 466 U.S. at 692. The district court did not address this factor. Accordingly, in light of my conclusion that counsel's performance was objectively unreasonable, I would vacate the district court's denial of Farhane's motion and remand to allow the district court to address the issue of prejudice in the first instance. *See, e.g.*, *Padilla*, 559 U.S. at 369 ("Whether Padilla is entitled to relief on his claim will depend on whether he can satisfy *Strickland*'s second prong, prejudice, a matter we leave to the Kentucky courts to consider in the first instance."); *Rodriguez*, 730 F. App'x at 44 (vacating the district court's denial of relief and "remand[ing] for the district court to develop a fuller record concerning the issue of prejudice").

## CONCLUSION

Farhane's guilty plea makes it virtually inevitable that he will lose his U.S. citizenship and be removed from this country—"banish[ed]" from his home of nearly

40

thirty years. *See DeGeorge*, 341 U.S. at 232 (Jackson, J., dissenting). His children, too, face the loss of their own citizenship. His trial counsel's failure to advise him that his plea agreement risked triggering these consequences constituted objectively unreasonable performance under prevailing professional norms in 2006, as it would now. Accordingly, the district court's judgment should be vacated and the case remanded for a determination, under *Strickland*, of whether Farhane was prejudiced by his counsel's constitutionally deficient performance. The Majority's contrary conclusion cannot be reconciled with the Supreme Court's decision in *Padilla*.

I respectfully dissent.